# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| JOHN CUMMING, derivatively on behalf of NEW SENIOR INVESTMENT GROUP, INC., | : <br> : <br> : <br> : |
| Plaintiff, | : <br> : |
| v. | :   **C.A. No. 13007-VCS** <br> : |
| WESLEY R. EDENS, SUSAN GIVENS, VIRGIS W. COLBERT, MICHAEL D. MALONE, STUART A. MCFARLAND, CASSIA VAN DER HOOF HOLSTEIN, FIG LLC, FORTRESS OPERATING ENTITY I LP, FIG CORPORATION, HOLIDAY ACQUISITION HOLDINGS LLC, and FORTRESS INVESTMENT GROUP LLC, | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |
| Defendants, | : <br> : <br> : |
| and | : <br> : |
| NEW SENIOR INVESTMENT GROUP, INC., | : <br> : <br> : |
| Nominal Defendant. | : |

## MEMORANDUM OPINION

Date Submitted:  November 21, 2017
Date Decided:  February 20, 2018

Jeffrey Gorris, Esquire, Christopher Foulds, Esquire and Christopher Quinn, Esquire of Friedlander & Gorris P.A., Wilmington, Delaware; David Wales, Esquire, David MacIsaac, Esquire and John Vielandi, Esquire of Bernstein Litowitz Berger & Grossmann LLP, New York, New York; Adam Warden, Esquire of Saxena White P.A., Boca Raton, Florida; Steven B. Singer, Esquire and Joshua H. Saltzman, Esquire of Saxena White P.A., White Plains, New York; J. Elazar Fruchter, Esquire of Wohl & Fruchter LLP, New York, New York, Attorneys for Plaintiff.

Robert S. Saunders, Esquire, Ronald N. Brown, III, Esquire, Sarah R. Martin, Esquire and Elisa M.C. Klein, Esquire of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware, Attorneys for Defendants.

**SLIGHTS, Vice Chancellor**

Plaintiff, John Cumming, is a stockholder of nominal defendant, New Senior Investment Group, Inc. ("New Senior"). He initiated this action derivatively on behalf of New Senior against members of the New Senior board of directors alleging they breached their fiduciary duties in connection with their approval of a transaction whereby New Senior acquired assets at an unfair price from an entity controlled by Fortress Investment Group, LLC ("Fortress"). Cumming asserts that a majority of the New Senior board was either interested in the transaction or disabled by conflicts arising from various relationships with a principal of Fortress, Wesley Edens. He further alleges that the transaction, comprised of three related and equally unfair elements, must be subject to the entire fairness standard of review. For both of these reasons, Cumming maintains that he is excused from demanding that the managers of New Senior assert these claims directly under either or both "prongs" of *Aronson*.[1]

Defendants have moved to dismiss Cumming's complaint under Court of Chancery Rules 23.1 and 12(b)(6). They argue he has failed to plead particularized facts to demonstrate demand excusal under Rule 23.1 and has failed to plead viable, non-exculpated claims that can survive their challenge under Rule 12(b)(6). I disagree. The complaint pleads sufficiently particularized facts to create a

---

[1] *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984) *overruled on other grounds*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) (citing 8 *Del. C.* § 141(a)) (holding that demand on a board is excused where a plaintiff alleges particularized facts creating a "reasonable doubt" that either (1) a majority of the directors were disinterested and independent, or (2) the challenged transaction was a valid exercise of business judgment).

reasonable doubt that a majority of the New Senior board was disinterested or independent. It also pleads facts that support a reasonable inference that the defendants breached their duty of loyalty by approving a conflicted, unfair transaction, and thereby pleads a non-exculpated claim under 8 *Del. C.* § 102(b)(7). Finally, the complaint pleads a reasonably conceivable claim of aiding and abetting a breach of fiduciary duty against Fortress (and its affiliates) by alleging that Fortress, as seller, knowingly exploited conflicts of interest among members of the New Senior board in order to facilitate the transaction and thereby advance its own interests (and those of the interested directors) at the expense of New Senior stockholders. Accordingly, the motion to dismiss must be denied as to all counts of the complaint.

## I. BACKGROUND

The relevant facts are drawn from the complaint's well-pled allegations, the documents the complaint incorporates by reference and those matters I am permitted to consider by stipulation of the parties.[2] For purposes of this motion to dismiss, the

---

[2] *EMSI Acq., Inc. v. Contrarian Funds, LLC*, 2017 WL 1732369, at *1 (Del. Ch. May 3, 2017). Plaintiff received certain documents from New Senior in response to a books and records demand. The parties agreed that documents produced in response to that demand would be deemed incorporated within the complaint whether or not referenced therein. Transmittal Aff. of Elisa M.C. Klein in Supp. of Defs.' Opening Br. in Supp. of their Mot. to Dismiss Pl.'s Verified Am. Deriv. Compl. ("Klein Aff.") Ex. 34 (Confidentiality Agreement) ¶ 7; Quinn Letter dated Nov. 16, 2017, Ex. 2, at 2. Notwithstanding this agreement, Plaintiff argues that Defendants have referred to materials outside of the produced or incorporated documents in resisting his motion to dismiss. Accordingly, he

2

Court accepts as true the well-pled facts in the Complaint and draws all reasonable inferences in Plaintiff's favor.[3]

## A. Parties and Relevant Non-Parties

Plaintiff, John Cumming, was a stockholder of New Senior at all relevant times and remains a New Senior stockholder today.[4] He purports to bring this action derivatively on behalf of New Senior.

Nominal Defendant, New Senior, is a Delaware corporation with its principal place of business in New York.[5] It has no employees of its own.[6] Rather, it is an externally-managed, publicly-traded real estate investment trust ("REIT") that owns a portfolio of senior housing facilities totaling 154 properties across the United

---

urges me to convert this motion into a motion for summary judgment, and then allow him to take discovery before addressing the motion. Pl.'s Answering Br. in Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Answering Br.") 17 n.8; Transcript of Oral Argument on Defs.' Mot. to Dismiss, Nov. 21, 2017, D.I. 33 ("Tr.") 62:12–63:5. Consistent with this Court's practice, beyond the four corners of the Verified Amended Derivative Complaint ("Complaint"), I have considered only those documents produced by New Senior in response to the Section 220 demand or incorporated by Cumming in his Complaint. "[I]f a document or the circumstances support more than one possible inference, and if the inference that [P]laintiff seeks is reasonable, then [P]laintiff [has] receive[d] the inference." *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 798 (Del. Ch. 2016). Thus, I decline Plaintiff's invitation to convert this motion into a motion for summary judgment.

[3] *Wayne Cty. Empls.' Ret. Sys. v. Corti*, 2009 WL 2219260, at *8 (Del. Ch. July 24, 2009).

[4] Verified Am. Deriv. Compl. ("Compl.") ¶ 21.

[5] Compl. ¶ 22.

[6] Compl. ¶ 29.

States.[7]  New Senior was originally formed as a subsidiary of Drive Shack, Inc. ("Drive Shack"), which is another publicly-traded REIT managed and dominated by Fortress.[8]  New Senior was spun off from Drive Shack in November 2014.[9]

Defendant, Fortress, is a global asset and investment management firm.[10] It was founded by, among others, Defendant, Wesley Edens ("Edens"), in 1998 and went public in 2007.[11]

Defendant, Fig LLC ("FIG"), is New Senior's manager and an indirect subsidiary of Fortress.[12]   FIG is wholly owned and managed by Defendant, Fortress Operating Entity I LP ("FOE I").[13]  FOE I's sole general partner is FIG Corporation ("FIG Corp."), a wholly-owned Fortress subsidiary.[14]  FIG Corp. and Fortress' three

---

[7] Compl. ¶ 22.

[8] Compl. ¶ 23.

[9] Compl. ¶ 23.

[10] Compl. ¶ 24.

[11] Compl. ¶ 24.  "As of April 2, 2015, Fortress, Edens and other New Senior insiders owned approximately 7.2% of New Senior's outstanding stock." Compl. ¶ 27.

[12] Compl. ¶ 31.  FIG also manages, *inter alia*, the Fortress funds that own Holiday, Drive Shack and Fortress investment funds that own a majority of Nationstar Mortgage Holdings, Inc. *Id.*

[13] Compl. ¶ 32.

[14] Compl. ¶ 33.  I note that the Complaint collectively refers to Fortress, FIG, FOE I and FIG Corp. as "Fortress."  Compl. ¶ 34.  I have done my best to differentiate among the entities, when necessary, with help of the parties' briefing and the incorporated documents. Otherwise, I adopt the convention utilized in the Complaint and refer to the Fortress entities

"principals" (including Edens) own 100% of FOE I's limited partnership interests.[15] "Fortress, FIG, FOE I, FIG Corp., Drive Shack, and New Senior all operate out of the same offices."[16]

Defendant, Holiday Acquisition Holdings LLC ("Holiday"),[17] "is the second largest private owner and operator of independent living communities for seniors in the United States."[18] In 2007, Holiday was acquired by Fortress Holiday Investment Fund ("FHIF"), a Fortress-managed private equity fund. Since then, it has been "controlled and majority-owned by Fortress," primarily through FHIF.[19]

At the time of the challenged transactions, New Senior's board of directors (the "Board" or the "New Senior Board") had six members: Edens, Susan Givens,

collectively as "Fortress." An organizational chart is attached as an appendix to this Memorandum Opinion.

[15] Compl. ¶ 33. Fortress' "principals" are Defendant Edens and non-parties, Peter L. Briger, Jr. and Randal A. Nardone. *Id.*

[16] Compl. ¶ 35.

[17] The portfolio of properties at issue here belonged to and was sold by Holiday Retirement, which is alleged to be an affiliate of Holiday Acquisition Holdings LLC (the only named "Holiday" defendant in this matter). Compl. ¶ 3 n.2. Because of the interrelationship of the Holiday companies, the Complaint refers to "Holiday Retirement, with its affiliates, including Harvest Facility Holdings LP, Holiday Facility Holdings, LP, Holiday Acquisition Holdings LLC, and Holiday AL Holdings LP" collectively as "Holiday." *Id.* Once again, I will follow the Complaint and refer to the Holiday entities collectively as "Holiday."

[18] Compl. ¶ 36.

[19] Compl. ¶ 36.

Virgis Colbert, Michael Malone, Stuart McFarland and Cassia van der Hoof Holstein, all of whom joined the Board by Fortress' designation in October 2014.[20] The committee of New Senior's board of directors organized to negotiate and consummate the transaction at issue here (the "Transaction Committee") comprised Malone, Van der Hoof Holstein, Colbert and McFarland.[21] As of the filing of this action, the Board consisted of seven members, the six members serving at the time of the challenged transaction and Robert Savage.[22] Savage is not a defendant in this action.

Defendant, Edens, is Fortress' founder and one of its "Principals."[23] He is also Fortress' largest stockholder[24] and the co-chairman of its board of directors.[25] At Fortress, "Edens is responsible for Fortress' private equity and publicly traded alternative investment businesses, which include both Holiday and New Senior."[26]

---

[20] Compl. ¶¶ 27, 37, 52, 60, 63, 134.

[21] Compl. ¶¶ 14–17.

[22] Compl. ¶ 134.

[23] Compl. ¶¶ 23, 33. The Complaint alleges that the three-person control group of Fortress together owns approximately 45% of Fortress' voting stock. Compl. ¶ 37.

[24] According to the Complaint, "[a]s of April 6, 2016, [Edens] owned approximately 22.6% of Fortress' Class A shares and about 27.2% of its Class B shares" making him Fortress' largest stockholder. Compl. ¶ 37.

[25] Compl. ¶¶ 24, 33, 37.

[26] Compl. ¶ 38.

6

Edens has been the Chairman of the New Senior Board since October 2014.[27] He also serves as a director of FIG Corp., as officer and general partner of the funds that own Holiday, and as a director of non-party, A&K Global Health LLC ("A&K"), which was founded by Fortress in 2011.[28] Along with Givens, he was designated as one of two members of the New Senior Board's pricing committee that determined the price of the equity offering used, in part, to fund the transaction at issue (the "Pricing Committee").[29]

Defendant, Givens, is New Senior's CEO and a member of its Board.[30] Givens also serves as managing director of Fortress' private equity group[31] and holds interests in Holiday through Fortress' private equity fund.[32] She was New Senior's lead negotiator in the acquisition of the portfolio of properties challenged here and, as noted, served on the two-person Pricing Committee alongside Edens.[33]

---

[27] Compl. ¶ 37.

[28] Compl. ¶¶ 33, 36, 39.

[29] Compl. ¶ 6.

[30] Compl. ¶ 41.

[31] Compl. ¶ 41.

[32] Compl. ¶¶ 41, 135. Givens did not disclose the amount of her ownership interest in Holiday in her director questionnaire. Transmittal Aff. of Christopher P. Quinn ("Quinn Aff.") Ex. 2, at SNR00000108.

[33] Compl. ¶ 41.

Defendant, Malone, served as Chairman of the Transaction Committee.[34] From 2008 to 2012, Malone served as managing director of Fortress.[35] He also sits on the boards of directors of a Fortress-affiliated company, non-party Nationstar Mortgage Holdings ("Nationstar"), and Walker & Dunlop, which provided financing for the challenged transaction.[36] Malone holds ownership interests in Fortress, New Senior and Walker & Dunlop.[37] At the time of the challenged transaction, Malone had retired from his Senior Executive Banker and Managing Director positions at Bank of America after 24 years of service and, thus, did not have full-time employment.[38] It is alleged he earned $1.7 million in director fees between 2012 and 2015 from Fortress-managed companies.[39]

Defendant, Van der Hoof Holstein, was added to the Transaction Committee by written consent after its inception.[40] In addition to her service on the New Senior

---

[34] Compl. ¶ 42.

[35] Compl. ¶¶ 43–44.

[36] Compl. ¶¶ 45–49.

[37] Compl. ¶¶ 44, 50.

[38] Klein Aff. Ex. 4 (2015 Proxy Statement), at 7.

[39] Compl. ¶ 51.

[40] Compl. ¶ 52.

Board, she also serves on the board of directors of A&K together with Edens.[41] Van der Hoof Holstein's full-time employment is with Partners in Health ("PIH"), a nonprofit medical organization, where she has served as Chief Partnership Integration Officer since 2010.[42] It is alleged that Edens' wife serves on the board of directors of PIH and that the Edens family is a "trusted partner" of the organization, donating money and otherwise providing significant support for PIH's worldwide relief efforts.[43]

Van der Hoof Holstein has also served as Associate Director of the Global Health Delivery Partnership ("GHDP") for the Department of Global Health and Social Medicine at Harvard Medical School since 2011.[44] According to the Complaint, GHDP has received continued substantial support from Edens over many years.[45]

Defendant, Colbert, was also a member of the Transaction Committee.[46] In addition to his service on the New Senior Board, Colbert "has served in a variety

---

[41] Klein Aff. Ex. 4 (2015 Proxy Statement), at 8; Compl. ¶ 39.

[42] Compl. ¶ 53.

[43] Compl. ¶¶ 54–56.

[44] Compl. ¶¶ 57–58.

[45] Compl. ¶ 15.

[46] Compl. ¶ 60.

9

of key leadership positions with Miller Brewing Company since 1979," and "continues to serve as Senior Advisor to MillerCoors LLC."[47] He previously served on the boards of directors for several other companies.[48] It is alleged that around the time Colbert became a member of the Board, Edens (as controlling owner) invited Colbert to join him as a co-owner of the Milwaukee Bucks (the NBA team), through Partners for Community Impact, LLC, and that Colbert accepted the invitation. Colbert now enjoys the unique opportunity of being a co-owner of an NBA franchise, along with approximately 24 others in the Bucks' ownership group.[49]

Defendant, McFarland, was the final member of the Transaction Committee.[50] McFarland also serves as a Fortress-designated director of Drive Shack, which, as mentioned, is managed by Fortress and was New Senior's parent prior to the spin-off in November 2014.[51] McFarland receives 60% of his publicly declared income

---

[47] Klein Aff. Ex. 4 (2015 Proxy Statement), at 6.

[48] Klein Aff. Ex. 4 (2015 Proxy Statement), at 6.

[49] Compl. ¶¶ 60, 62.

[50] Compl. ¶ 63.

[51] Compl. ¶¶ 23, 63.

from his various board fees.[52]  He lists his address with the SEC for investment purposes (for non-Fortress investments) as "C/O Fortress Investment Group."[53]

**B. New Senior's Spin-Off**

New Senior was spun off from Drive Shack in 2014 (the "Spin-Off").[54]  Prior to the Spin-Off, "Drive Shack was dominated by Fortress, as most of Drive Shack's board and management were affiliated with Fortress."[55] Edens served as the chairman of Drive Shack's board from 2002 until May 2016 and as its CEO from 2002 until 2007.[56]  As part of the Spin-Off, Fortress "appointed all of New Senior's directors, classified the Board with staggered terms, and severely curtailed the filling of director vacancies and the removal of directors."[57]  It also "installed Fortress-affiliated personnel as the senior management of New Senior."[58]

---

[52] Compl. ¶ 63.

[53] Compl. ¶ 63.

[54] Compl. ¶ 3.

[55] Compl. ¶ 26.

[56] Compl. ¶ 26.

[57] Compl. ¶ 27.

[58] Compl. ¶ 28.

## C. The FIG-New Senior Management Agreement

"In conjunction with the Spin-Off, New Senior entered into a management agreement [] with Fortress' subsidiary FIG[], pursuant to which FIG[] manages New Senior's day-to-day operations."[59]   Thus, all of New Senior's management is employed by FIG.  Under the management agreement, FIG receives compensation in the form of an annual management fee of 1.5% of New Senior's gross equity as well as incentive compensation of 25% on New Senior's returns above a certain threshold.[60]  The management agreement further provides that FIG is to receive 10% of the number of shares sold in any stock offering at the offering's exercise price.[61]

According to New Senior's public disclosures, New Senior is "completely reliant on [FIG]."[62]  Thus, New Senior is "subject to the risk that [FIG] will terminate

---

[59] Compl. ¶ 28.  At the time of the challenged transaction, New Senior's management team consisted of: (i) Givens, New Senior's CEO and Fortress' private equity group's managing director; (ii) Justine Cheng, New Senior's CFO, Treasurer and COO and also a managing director of Fortress' private equity group, employed by Fortress since 2004; (iii) Julien P. Hontang, New Senior's Chief Accounting Officer and managing partner of Fortress' private equity fund; and (iv) Cameron MacDougall, New Senior's secretary and a managing partner and general counsel of Fortress' private equity fund, employed by Fortress since 2007.  Compl. ¶ 29.

[60] Klein Aff. Ex. 1 (FIG Management Agreement), at 9.  "Gross Equity" is defined as "for any period [] (A) the sum of (i) the 'Total Equity,' plus (ii) the value of contributions made by partners other than [New Senior], from time to time, to the capital of any subsidiary . . . less (B) any capital dividends or capital distributions . . . ." *Id.*

[61] Klein Aff. Ex. 1 (FIG Management Agreement), at 10.

[62] Klein Aff. Ex. 25 (Preliminary Prospectus Supplement June 22, 2015), at S-22.

the Management Agreement and that [New Senior] will not be able to find a suitable replacement for [its] [m]anager in a timely manner, at a reasonable cost or at all."[63] The public disclosures confirm that the management agreement was "not negotiated at arm's length, and its terms, including fee payable, may not be as favorable to [New Senior] as if it had been negotiated with an unaffiliated party."[64]

## D. The Challenged Transaction

The transaction at issue here is more accurately described as three separate (but inextricably intertwined) transactions, each of which Plaintiff alleges was detrimental to New Senior. *First*, the overarching transaction was New Senior's acquisition of a portfolio of properties (the "Holiday Portfolio") from Defendant Holiday (the "Acquisition") at an allegedly unfair price. *Second*, New Senior financed the Acquisition (in part) through an equity offering that allegedly favored Fortress to the detriment of New Senior. And *third*, New Senior entered into a property management agreement with Holiday to manage the Holiday Portfolio at allegedly higher-than-market rates (collectively the "Challenged Transactions").[65]

---

[63] Klein Aff. Ex. 25 (Preliminary Prospectus Supplement June 22, 2015), at S-22.

[64] Klein Aff. Ex. 25 (Preliminary Prospectus Supplement June 22, 2015), at S-22.

[65] New Senior and Holiday Acquisitions Holdings, LLC were the parties to the management agreement. Klein Aff. Ex. 35 (2016 Proxy Statement), at 26.

## 1. The Acquisition

The Board was first made aware of the possibility of acquiring the Holiday Portfolio at a meeting on May 5, 2015.[66] At that meeting, "Givens informed three members of the Board that Holiday had solicited bids for the sale of the Holiday Portfolio" and that she "expected to submit a bid" on New Senior's behalf.[67] She also "indicated the expected price range for the portfolio."[68] In her presentation, Givens advised the Board that the Acquisition would be part of New Senior's "key initiative" to "build pipeline and close on new acquisitions."[69] In response to Givens' announced intentions, the Board discussed its plan to form a transaction committee "if [New Senior] were invited to proceed to the second round of bidding."[70]

When the Board next met to discuss the possible acquisition, on May 15, 2015, Givens reported that she had already made an opening non-binding bid of

---

[66] This meeting was attended by "Fortress-affiliated members of New Senior's management team." Compl. ¶ 73 n.8. None of the Fortress-affiliated employees recused themselves from the meeting. Compl. ¶ 75. Neither Van der Hoof Holstein nor Edens were present. Compl. ¶ 73 n.8; Klein Aff. Ex. 5 (May 5, 2015 Board Minutes).

[67] Compl. ¶ 73.

[68] Klein Aff. Ex. 5 (May 5, 2015 Board Minutes).

[69] Klein Aff. Ex. 6 (Board Presentation May 5, 2015), at SNR00000230-231.

[70] Klein Aff. Ex. 5 (May 5, 2015 Board Minutes).

$660 million for the Holiday Portfolio.[71] She then outlined the specifics of the bid, including that "Fortress and its affiliates would manage the Holiday Portfolio post-acquisition,"[72] that "management had begun speaking to lenders about potential financing" and that, "in the event the Company won the auction, she would recommend conducting an equity offering in order to fund a portion of the purchase price."[73] Givens explained that Holiday was motivated to sell "because the funds that own a majority of Holiday [were] seeking to monetize their investments in order to return capital to [their] investors in the near term."[74] She closed by emphasizing that she expected the sales process to be "very competitive."[75]

Following Givens' presentation and the Board's discussion of the proposed acquisition, Cameron MacDougall, the Board's Secretary and a managing director and general counsel of Fortress, outlined the process by which the Board should evaluate the proposed acquisition and answered Board member questions regarding

---

[71] Compl. ¶¶ 73, 77; Klein Aff. Ex. 7 (May 15, 2015 Board Minutes). Plaintiff alleges that "Givens never explained how she calculated the $660 million bid amount." Pl.'s Answering Br. 15. Indeed, the May 15 Board Minutes are silent as to how the bid was calculated. Klein Aff. Ex. 7.

[72] Compl. ¶¶ 78–80, Klein Aff. Ex. 7 (May 15, 2015 Board Minutes), at 2.

[73] Klein Aff. Ex. 7 (May 15, 2015 Board Minutes).

[74] Klein Aff. Ex. 7 (May 15, 2015 Board Minutes), at 2.

[75] Compl. ¶ 77.

15

applicable legal standards.[76] The Board did not seek out or receive independent legal or financial advice at this time.[77] Based on the information provided, the Board agreed to form the Transaction Committee at this meeting but did not actually do so until later.[78] Edens recused himself from this May 15 meeting and declared that he would continue to recuse himself from meetings where the Board intended to discuss a potential acquisition of the Holiday Portfolio due to his affiliation with Fortress.[79]

The Board met again on May 18, 2015, and again Givens requested that MacDougall advise the Board on its actions in evaluating the potential acquisition.[80] The Board decided that the Transaction Committee would comprise Malone, Colbert and McFarland. It was determined that Van der Hoof Holstein could not join the Transaction Committee at that time given her other commitments.[81] While its members were selected, the Board, again, elected not to form the Transaction Committee at this meeting. The Board did, however, interview candidates to serve

---

[76] Compl. ¶ 79; Klein Aff. Ex. 4 (2015 Proxy Statement), at 16; Klein Aff. Ex. 7 (May 15, 2015 Board Minutes), at 2.

[77] Compl. ¶ 79.

[78] Compl. ¶ 79; Klein Aff. Ex. 7 (May 15, 2015 Board Minutes), at 2.

[79] Compl. ¶ 74; Klein Aff. Ex. 7 (May 15, 2015 Board Minutes).

[80] Compl. ¶ 81.

[81] Compl. ¶ 81.

as independent counsel for the Transaction Committee, and ultimately decided to retain Davis, Polk & Wardwell ("Davis Polk").[82]

The next day, the Board finally resolved to form the Transaction Committee (comprising Malone, Colbert and McFarland, with Malone as Chairman) and delegated to this committee the full authority to consider and accept or reject the potential acquisition.[83] During this meeting, the Board was informed, for the first time, of Givens' interest in the transaction due to her indirect ownership interest in Holiday.[84] Notwithstanding this revelation, it does not appear that the Board pressed for specifics regarding the extent of Givens' interest in Holiday or the extent to which she would or should remain involved in the negotiations.[85] While Givens recused herself from the meeting, she continued thereafter to function as New Senior's lead negotiator.[86]

On May 29, 2015, Givens learned that the two other bidders for the Holiday Portfolio had dropped out of the bidding process.[87] Without input from

---

[82] Compl. ¶ 81.

[83] Klein Aff. Ex. 10 (May 19, 2015 Board Minutes), at SNR00000238; Compl. ¶ 82.

[84] Compl. ¶ 82.

[85] Compl. ¶ 82.

[86] Compl. ¶ 82.

[87] Compl. ¶ 83; Klein Aff. Ex. 11 (May 19, 2015 Committee Minutes). Plaintiff alleges that the documents produced in response to his books and records demand did not disclose any final bids from other potential bidders. Compl. ¶ 76; Pl.'s Answering Br. 17 n.8.

(or knowledge of) the Transaction Committee or the Board, Givens reduced New Senior's bid by $20 million (to $640 million).[88] The Transaction Committee was not informed of the revised bid until its first meeting on June 1, 2015, when Givens (who was in attendance along with three other Fortress-affiliated individuals) advised that the remaining bidders had dropped out, announced that she had unilaterally lowered the bid and declared that final bids were due on June 5, 2015, only four days later.[89] Davis Polk was not in attendance at this meeting.[90]

Givens explained that her reduced $640 million bid was "derived by applying the capitalization rate implied by the purchase price for the last portfolio marketed

---

Having found nothing in the documents that contradicts this allegation, for purposes of this motion, I accept the allegation as true.

[88] Compl. ¶ 83.

[89] Compl. ¶¶ 85–86. Plaintiff and Defendants disagree whether the bids due on June 5 were still to be non-binding. Defendants assert that the bids were to remain non-binding, that the Transaction Committee was free to walk away from the Acquisition and that there is "no support in the *Yahoo* record that the company was committed to anything. It made a nonbinding proposal." Tr. 11:6–8; Defs.' Opening Br. in Supp. of the Mot. to Dismiss Pl.'s Verified Am. Deriv. Compl. ("Defs.' Opening Br.") 12–13. Plaintiff, on the other hand, asserts that none of the so-called *Yahoo* documents support the contention that the offer was "non-binding" and, therefore, I must either ignore Defendants' assertion to the contrary or convert this motion into a motion for summary judgment. Pl.'s Answering Br. 17 n.9. At this stage, because the documents incorporated in the Complaint do not speak to the character of the bid provided to Holiday as of June 5, I will accept as true Plaintiff's allegation that the bid was binding upon New Senior.

[90] Compl. ¶ 98.

18

by Holiday and sold to Northstar Realty Finance Corporation [], which was 6.1%."[91] In presenting this justification for the revised bid, Givens failed to "disclose whether Northstar was the only bidder for its asset purchase from Holiday" and wrongfully compared the Northstar deal occupancy rate, which was 90%, to the 87.6% rate purportedly implicated by the Holiday Portfolio.[92] These flaws, according to Plaintiff, rendered the Northstar deal inapposite. Moreover, none of the values used by Givens to support her lowered bid were or could be independently verified.[93]

As of this first meeting of the Transaction Committee, even though only New Senior remained in the process, Citigroup, the broker for the proposed acquisition, still had not declared New Senior as the winning bidder. Nevertheless, Givens advised the Transaction Committee that she expected that announcement to occur

---

[91] Compl. ¶ 89.

[92] Compl. ¶¶ 90, 92.

[93] Compl. ¶ 91. Plaintiff alleges that "the minutes of the June 1, 2015 Transaction Committee meeting reflect no discussion or debate concerning whether New Senior's enhanced bargaining position warranted a substantially larger reduction than a mere $20 million in New Senior's initial $660 million bid." Compl. ¶ 87. The minutes from that meeting state that "[t]he Transaction Committee engaged in a robust discussion regarding the information conveyed by Ms. Givens. They asked a variety of questions regarding the expected risks and benefits of the acquisition, the proposed capitalization rate, and the terms of the purchase agreement, and each question was answered to the Transaction Committee's satisfaction." Klein Aff. Ex. 11 (June 1, 2015 Committee Minutes), at 2. At this stage, drawing all reasonable inferences in Plaintiff's favor, I find that the particularized facts pled support Plaintiff's allegation that Givens was not pressed to justify her decision to reduce the bid by only $20 million.

soon.[94]  With the end of the process in sight, Givens suggested that the Transaction Committee select a financial advisor to assess the fairness of the proposed price and assured the Committee that, in the meantime, she would negotiate further favorable price adjustments.[95]  Givens ultimately negotiated an additional $5 million in capital expenditure adjustments.[96]

At its June 2 meeting, the Transaction Committee retained Greenhill & Co. ("Greenhill") as its financial advisor.[97]  The following day, Givens made a presentation to Greenhill in which she outlined the specific terms of the Acquisition and explained that the draft agreement did not contain a financing contingency because "New Senior had determined that agency financing was preferable."[98]

On June 16, 2015, the entire Board met to consider the Acquisition and to hear from Givens and Edens regarding their views in support of the transaction.[99]

---

[94] Klein Aff. Ex. 11 (June 1, 2015 Committee Minutes), at 2.

[95] Compl. ¶¶ 98–99.

[96] Compl. ¶ 99.

[97] Compl. ¶ 101; Klein Aff. Ex. 14 (June 2, 2015 Committee Minutes).  Notably, Greenhill was not retained until after Givens had already submitted the final bid of $640 million. Compl. ¶ 101.

[98] Compl. ¶ 102.  Plaintiff is highly critical of the fact that no reason was given for failing to include a financing contingency in the final bid for New Senior's protection, especially given its leverage as the sole bidder for the assets.  *Id.*  Defs.' Reply Br. in Further Supp. of Their Mot. to Dismiss Pl.'s Verified Am. Deriv. Compl. ("Defs.' Reply Br.") 18–19.

[99] Klein Aff. Ex. 18 (June 16, 2015 Board Minutes).

20

Immediately following this Board meeting, the Transaction Committee met and, after a briefing by Givens, management left the meeting. [100] With management out of the room, Malone requested that Greenhill provide an overview of the transactional structure including an analysis of the conflicts of interest.[101] Greenhill complied and then reviewed its preliminary analysis of the "fairness, from a financial point of view, to [New Senior] of the [c]onsideration to be paid."[102] This analysis included comparable transactions (although Greenhill noted that the senior living market made this "analysis relatively less meaningful"), a discounted cash flow analysis and the view of certain Wall Street research analysts.[103] The meeting lasted about two hours.[104]

On June 21, 2015, the meeting of the Transaction Committee once again began with a presentation from lead negotiator Givens, this time focused on the proposed financing plan and other more granular aspects of the Acquisition.[105] After

---

[100] Klein Aff. Ex. 19 (June 16, 2015 Committee Minutes). Van der Hoof Holstein began attending Transaction Committee meetings on June 10, 2015, although she was not designated as a member of the Committee until June 19. Compl. ¶ 103.

[101] Klein Aff. Ex. 19 (June 16, 2015 Committee Minutes).

[102] Compl. ¶¶ 102, 104; Quinn Aff. Ex. 5 (Greenhill Fairness Opinion), at 4; Klein Aff. Ex. 19 (June 16, 2015 Committee Minutes), at SNR00000248.

[103] Klein Aff. Ex. 19 (June 16, 2015 Committee Minutes), at SNR00000249.

[104] Compl. ¶¶ 102, 104; Quinn Aff. Ex. 5 (Greenhill Fairness Opinion), at 4.

[105] Klein Aff. Ex. 22 (June 21, 2015 Committee Minutes).

21

management left the meeting, the Committee received Greenhill's final fairness presentation and unanimously determined to recommend that the Board authorize the Acquisition.[106]  Immediately thereafter, the Board convened a meeting and approved the Acquisition with both Edens and Givens recusing.[107]  No stockholder vote was requested.[108]

## 2.  The Secondary Offering

The Acquisition was financed in part by a secondary public offering of New Senior common stock (the "Secondary Offering").[109]  The Board delegated the task of determining the terms of the Secondary Offering to Edens and Givens by resolution dated June 21, 2015, appointing them as the sole members of the Pricing Committee.[110]  On June 23, 2015, the Pricing Committee met for the first time and resolved to offer \$266,973,360[111] in equity at a price of \$13.75 per share.[112]  Only a

---

[106] Compl. ¶¶ 106–07; Klein Aff. Ex. 22 (June 21, 2015 Committee Minutes).

[107] Klein Aff. Ex. 24 (June 21, 2015 Board Minutes), at SNR00000260–61.

[108] Compl. ¶ 19.

[109] Klein Aff. Ex. 24 (June 21, 2015 Board Minutes), at SNR00000266; Compl. ¶ 109.

[110] Compl. ¶ 109; Klein Aff. Ex. 24 (June 21, 2015 Board Minutes), at SNR00000266.

[111] Compl. ¶ 110.

[112] Compl. ¶ 120.  New Senior's stock closed at \$15.25 one day prior to the Secondary Offering.  *Id.*  Neither the Board, the Transaction Committee nor the Pricing Committee ever questioned this discount.  Compl. ¶ 113.

portion of the money raised through the equity offering was used to finance the Acquisition.[113]

Edens and Givens received shares in the Secondary Offering totaling 72,727,[114] and FIG was granted a ten-year option to acquire 2,011,409 New Senior shares for the $13.75 offering price pursuant to its management agreement with New Senior.[115] Greenhill did not assess the Secondary Offering as part of its fairness opinion and the Board was not apprised of either the number of shares to be offered or the offering price prior to approving the Acquisition.[116] New Senior announced

---

[113] Compl. ¶ 110. As discussed below, Plaintiff alleges Edens and Givens caused New Senior to offer more equity than was needed to complete the Acquisition out of self-interest. Compl. ¶ 111.

[114] Compl. ¶ 122. The Complaint alleges that Edens, through a side agreement, was entitled directly to purchase 72,727 shares at the offering price and that an additional 102,917 shares were allocated to certain employees and officers (also at the offering price) with 14,545 shares allocated to Givens. *Id.*

[115] Compl. ¶ 121. The management agreement entitled FIG to 10% of the shares sold in an equity offering. Klein Aff. Ex. 1 (FIG Management Agreement).

[116] Compl. ¶ 112; Quinn Aff. Ex. 5 (Greenhill Fairness Opinion), at 3. The June 21 Board Minutes state that MacDougall (not Davis Polk) "reviewed the terms of the equity offering" with the Board. Klein Aff. Ex. 24 (June 21, 2015 Board Minutes), at SNR00000261. Aside from that mention, the documents incorporated in the Complaint, contrary to Defendants' assertion, lead to the reasonable inference that the Board was not aware of the pricing of the shares to be sold in the equity offering prior to the creation of the Pricing Committee. *See, e.g.*, Klein Aff. Ex. 24 (June 21, 2015 Board Minutes), at SNR00000267:

> RESOLVED, that the Board hereby approves the Offering and the sale and issuance of the Shares for a maximum aggregate offering price not to exceed $300 million (plus a 15% overallotment option) and on such other terms to be determined by the Pricing Committee . . .

23

the Secondary Offering on June 25, 2015.[117]  The market reacted poorly; New Senior stock closed at $14.14 on June 23 and dropped to $13.65 on June 26.[118]

### 3.  The Holiday Management Agreement

As part of the Acquisition, Holiday and New Senior entered into a no-bid management agreement (the "Holiday Management Agreement") under which Holiday would continue to manage the Holiday Portfolio.[119]   The Holiday Management Agreement provided that Holiday would be compensated with 5% of New Senior's revenues as well as an incentive fee of 20% above a designated threshold.[120]  These fees were significantly above market.[121]

---

[117] Compl. ¶ 18.  New Senior retained Citigroup as one of the underwriters and joint-book-running managers of the Secondary Offering even though Citigroup had represented Holiday and Fortress during the sale process leading up to the Acquisition.  Compl. ¶¶ 114–15.

[118] Compl. ¶ 18.   Defendants contend that "[o]ver 60 potential investors submitted indications of interest in the Secondary Offering.  Of those 60, nearly one-third placed a limit at or below $13.75 [per share].  Only 11 placed a limit above $13.75, and they only did so for an indication totaling less than $40 million, a woefully insufficient figure."  Defs.' Opening Br. 20 (internal citation omitted).

[119] Compl. ¶ 95.

[120] Compl. ¶ 95; Klein Aff. Ex. 35 (2016 Proxy Statement), at 26.

[121] Compl. ¶ 95 ("[C]ertain other managers charge a fixed amount of only 3% of revenues and certain other managers receive no incentive fee. As Givens conceded in her September 2015 Interview, there are only 'some cases' where property managers are paid an incentive fee based on performance. Indeed, Holiday charges no incentive fee to New Senior for the 'Hawthorn' property portfolio that New Senior purchased from Holiday.") (internal quotation omitted).

24

A Greenhill presentation made to the Transaction Committee indicates that the terms of the Holiday Management Agreement were first disclosed to the Committee during a June 2015 meeting.[122] As with the Secondary Offering, Greenhill did not opine on the fairness of the Holiday Management Agreement.[123] Nor is there any indication that the Transaction Committee looked into or interviewed other managers for the Holiday Portfolio or even attempted to negotiate more favorable terms.[124]

**E. Fortress' Alleged Interest in the Transactions**

Plaintiff alleges that Edens and Givens caused New Senior to enter into the Challenged Transactions to advance certain of Fortress' own interests, including: (1) Fortress' planned shift of assets to publicly-traded companies; (2) the approaching maturity date of FHIF (through which Fortress held its interests in Holiday); (3) the increase in FIG's management fees resulting from the Secondary Offering; and (4) the increase in fees received through the Holiday Management Agreement as outlined previously. I discuss each briefly below.

---

[122] Klein Aff. Ex. 12 (Transaction Committee Presentation: Holiday 28 Portfolio), at SNR0000038–39. The Complaint alleges that the Transaction Committee did not consider the Holiday Management Agreement and was not even apprised of its exact terms until after approval of the Acquisition. Compl. ¶¶ 96–97.

[123] Quinn Aff. Ex. 5 (Greenhill Fairness Opinion), at 2.

[124] Compl. ¶ 96.

## 1. The Planned Shift of Assets

At the time of the Acquisition, Fortress was in the midst of a plan to shift its assets under management from private equity funds, like the funds that own Holiday, to its Permanent Capital Vehicles ("PCVs"), like New Senior.[125] This shift would yield a greater return to Fortress because Fortress could "charge higher fees on the gross equity and operating results [of PCVs] . . . over a longer time period."[126] Fortress disclosed this plan in a 2013 presentation where it outlined the "economic benefits of its 'New Model.'"[127] Presentations in 2014 and 2015 evidence Fortress' execution of the plan.[128]

The sale of the Holiday Portfolio to New Senior was executed in furtherance of the New Model, as revealed in a statement made by Givens in an interview with *Seniors Housing Business* published in September 2015:

> New Senior has been, and we expect it will continue to be, Fortress' dedicated vehicle for investing in the seniors housing industry. While the private equity funds have a finite life to them, New Senior is one of the permanent capital vehicles at Fortress, given it is a public company with no time period upon which the equity has to be returned to investors.[129]

---

[125] Compl. ¶ 72.

[126] Compl. ¶¶ 9, 67, 70.

[127] Compl. ¶ 67.

[128] Compl. ¶¶ 70–71; Quinn Aff. Ex. 1 (Fortress Presentation), at 8–9.

[129] Compl. ¶¶ 29, 66.

### 2. The Looming Maturity of FHIF

Prior to the close of the Acquisition, Fortress was in need of liquidity because its fund, FHIF, through which it held its majority interest in Holiday, had a maturity date of January 2017, at which time FHIF was to return capital to its investors.[130] By selling the Holiday Portfolio to New Senior at an inflated price, Holiday seized an opportunity to facilitate the delivery of promised returns.[131]

### 3. Increase of New Senior's Gross Equity

Plaintiff alleges that Fortress, Edens and Givens received unfair benefits from the $266 million Secondary Offering (of which only $175.3 million was used for the Acquisition) at the expense of New Senior in two ways: (1) the stock was offered at a "deep discount to the market price" and the offering included an award of options to Fortress, Edens and Givens at that discounted price; and (2) the Secondary Offering increased New Senior's gross equity resulting in higher management fees to FIG (under pre-existing agreements) and a depressed New Senior share price, all compounded by the fact that Edens and Givens saw to it that more equity was issued than was needed to fund the Acquisition.[132] Indeed, the increase of gross equity from

---

[130] Compl. ¶ 4.

[131] Compl. ¶ 4.

[132] Compl. ¶¶ 6–8, 110–111, 115. The Secondary Offering caused New Senior's market capitalization to drop by $100 million. Compl. ¶ 102.

the Secondary Offering led to an increase in FIG's management fees from $8.5 million in 2014 to $14.3 million in 2015.[133] Because the acquisition agreement did not contain a financing contingency, New Senior was locked into the Secondary Offering even if the market responded poorly to news of the Acquisition (which it did).[134]

### 4. Holiday Benefits

As noted, Givens arranged for Holiday to earn substantial fees through the Holiday Management Agreement. These fees benefited FHIF and ultimately Fortress.

### F. Procedural Posture

Plaintiff filed his Verified Derivative Complaint on December 27, 2016. Defendants filed their first motion to dismiss on March 16, 2017. Plaintiff responded by filing his Verified Amended Derivative Complaint on June 8, 2017.[135] The Complaint has three counts: Count I asserts a breach of fiduciary duty claim against all of the directors of New Senior (excluding Robert Savage); Count II asserts a breach of fiduciary duty claim against Givens as an officer of New Senior; and

---

[133] Compl. ¶ 119.

[134] Compl. ¶ 113.

[135] D.I. 12. *See* Del. Ct. Ch. R. 15(aaa).

Count III asserts an aiding and abetting breaches of fiduciary duty claim against Fortress, Holiday, FIG, FOE I and FIG Corp.

Defendants now move to dismiss the Complaint for failure adequately to plead demand futility under Court of Chancery Rule 23.1 and failure to state a viable claim under Rule 12(b)(6). According to Defendants, Plaintiff cannot plead demand futility because a majority of the Board was disinterested and independent and the Challenged Transactions were products of valid exercises of the Board's business judgment.[136]

In riposte, Plaintiff argues that demand is excused as futile because there is reason to doubt (1) the disinterestedness and independence of a majority of the Board at the time of the filing of this action and (2) that the Challenged Transactions were otherwise the proper exercise of business judgment.[137] Thus, Plaintiff argues he has satisfied both prongs of *Aronson*.[138] As for the Rule 12(b)(6) motion, Plaintiff argues that he has pled sufficient facts to state claims for both breach of the duty of care and breach of the duty of loyalty. He also argues that entire fairness is the standard of review and that the pled facts support a reasonable inference of an unfair price and

---

[136] Defs.' Opening Br. 2–4.

[137] In his first complaint, Plaintiff alleged that Fortress was a controlling stockholder of New Senior. The now-operative Complaint no longer makes that claim.

[138]*Aronson*, 473 A.2d 805; Pl.'s Answering Br. 41.

29

unfair process with respect to the Challenged Transactions.[139] These same pled facts, according to Plaintiff, overcome Defendants' Section 102(b)(7) defense.

## II.  ANALYSIS

There is no question that Cumming's claims challenging the Board's determination to acquire assets are derivative claims that ultimately belong to New Senior.  It is appropriate, therefore, first to take up the threshold question of whether Cumming may bring these claims on behalf of New Senior.  Because I find that Cumming has pled particularized facts that support a finding of demand futility such that he may bring this action derivatively, I must also consider whether he has stated viable claims to survive Defendants' motion under Rule 12(b)(6).  For the reasons that follow, I conclude that he has.

### A. Plaintiff Has Adequately Pled Demand Futility

"[A] cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation."[140]  As noted, Plaintiff's claims here allege harm suffered by New Senior.  The claims, therefore, belong to the Company and the decision whether or

---

[139] Pl.'s Answering Br. 62 (arguing that Defendants "cannot establish entire fairness on a motion to dismiss").

[140] *Aronson*, 473 A.2d at 811.

not to pursue them typically would rest with the Board.[141]  A board of directors does not stand alone, however, in its authority to initiate litigation on behalf of the corporation.  In certain circumstances, stockholders may pursue litigation derivatively on behalf of the corporation as a matter of equity to "redress the conduct of a torpid or unfaithful management . . . where those in control of the company refused to assert a claim belonging to it."[142]

Because the derivative plaintiff who elects not to make a demand "seeks to displace the board's authority," it is appropriate to require that he plead particularized facts that "create a reasonable doubt" as to whether the board is fit to consider the demand.[143]  When the complaint challenges a business decision of the board, *Aronson* instructs that the derivative plaintiff meets his burden to plead demand futility by pleading particularized facts that create either (1) a reasonable doubt that the board of directors that would respond to the demand was disinterested and independent **or** (2) a reasonable doubt that "the challenged transaction was

---

[141] *White v. Panic*, 783 A.2d 543, 550 (Del. 2001) (stating that "[i]n most situations, the board of directors has sole authority to initiate or to refrain from initiating legal actions asserting rights held by the corporation").

[142] *Aronson*, 473 A.2d at 811.

[143] *La. Mun. Police Empls.' Ret. Sys. v. Pyott*, 46 A.3d 313, 351 (Del. Ch. 2012) (citation omitted), *rev'd on other grounds*, *Pyott v. La. Mun. Police Empls.' Ret. Sys.*, 74 A.3d 612 (Del. 2013).

otherwise the product of a valid exercise of business judgment."[144] The "reasonable doubt" standard articulated in *Aronson* is not the same as the burden of proof imposed upon the prosecution in a criminal case.[145] It is, instead, a more literal distillation of the phrase meaning simply "that there is reason to doubt."[146]

Rule 23.1 places a heightened pleading burden on the plaintiff to meet "stringent requirements of factual particularity that differ substantially from the permissive notice pleadings" embodied in Court of Chancery Rule 8 and that animate Court of Chancery Rule 12(b)(6).[147] Even so, the court is still "bound to draw all reasonable inferences from those particularized facts in favor of the plaintiff, not the defendant, when dismissal of a derivative complaint is sought."[148]

---

[144] *Aronson,* 473 A.2d at 814.

[145] *Grimes v. Donald*, 673 A.2d 1207, 1217 (Del. 1996).

[146] *Id.* *Grimes* explains that another way to construe *Aronson*'s "reasonable doubt" standard is to inquire whether the stockholder has articulated "a 'reasonable belief' (objectively) that the board lacks independence or that the transaction was not protected by the business judgment rule." *Id.* The standard is "sufficiently flexible and workable to provide the stockholder with the 'keys to the courthouse' in an appropriate case where the claim is not based on mere suspicions or stated solely in conclusory terms." *Id.*

[147] *Brehm*, 746 A.2d at 254.

[148] *Del. Cty. Empls. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1022 (Del. 2015); *Pyott*, 46 A.3d at 351 (explaining that the "requirement of factual particularity does not entitle a court to discredit or weigh the persuasiveness of well-pled allegations" and that Plaintiff must only plead specific facts and is not required to plead evidence or "facts sufficient to sustain a 'judicial finding.'").

Plaintiff did not make a demand on the Board. Therefore, as he must, he has endeavored to plead demand futility. While he need only do so under either of *Aronson*'s prongs, Plaintiff contends that he has pled demand futility under both. Because I find that the Complaint pleads futility under the first prong, I need not and decline to reach Plaintiff's arguments that he has satisfied the second prong as well.

In order to plead futility under *Aronson*'s first prong, the complaint must raise a reasonable doubt that a majority of the directors could have evaluated a demand independently and without self-interest.[149] When determining whether the complaint pleads director interest or lack of independence, the court does not consider the pled facts in isolation but instead considers them in totality.[150]

The court will deem a director "interested" for purposes of this analysis when he stood on both sides of the transaction at issue or stood to receive a material benefit that was not to be received by others.[151] A material benefit is one that is "significant enough in the context of the director's economic circumstances, as to have made it

---

[149] *Brehm*, 746 A.2d at 256–57.

[150] *See Sanchez,* 124 A.3d at 1019 ("it is important that the trial court consider all the particularized facts pled by the plaintiffs about the relationships between the director and the interested party in their totality and not in isolation from each other, and draw all reasonable inferences from the totality of those facts in favor of the plaintiffs").

[151] *Chester Cty. Empls.' Ret. Fund v. New Residential Inv. Corp.*, 2016 WL 5865004, at \*9 (Del. Ch. Oct. 7, 2016); *Robotti & Co. v. Liddell,* 2010 WL 157474, at \*12 (Del. Ch. Jan. 14, 2010).

improbable that the director could perform her fiduciary duties."[152]  A pleading of materiality, however, is only required "in the absence of self-dealing."[153]

The inquiry for director independence is contextual and asks whether a director's decision was "based on the merits of the subject before the board rather than on extraneous considerations or influences."[154]  "To show lack of independence, the plaintiff must allege that a director is so beholden to an interested director that his or her discretion would be sterilized."[155]  Specifically, the relationship between the challenged director and the interested director must be "so close that one could infer that the non-interested director would be more willing to risk his or her reputation than risk the relationship with the interested director."[156]

The parties agree that the members of the New Senior Board that would have considered Plaintiff's demand (if he had made one) comprised directors Savage, Edens, Givens, Malone, Van der Hoof Holstein, Colbert and McFarland.  The

---

[152] *Robotti*, 2010 WL 157474, at *12; *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1151 (Del. Ch. 1994) ("not every financial interest in a transaction that is not shared with shareholders [is] sufficient").

[153] *Cambridge Ret. Sys. v. Bosnjak*, 2014 WL 2930869, at *5 (Del. Ch. June 26, 2014) (internal quotation omitted).

[154] *Chester Cty.*, 2016 WL 5865004, at *9; *Orman v. Cullman*, 794 A.2d 5, 25 n.50 (Del. Ch. 2002).

[155] *Chester Cty.,* 2016 WL 5865004, at *9.

[156] *Robotti*, 2010 WL 157474, at *12.

34

Court's function now is to "count heads."[157]  By requesting books and records from New Senior prior to filing his Complaint, Cumming has done what our courts have long counseled plaintiffs to do: he has utilized the tools provided by our law to gain access to documents that allowed him to plead specific facts that support his allegations of interest and lack of independence.[158]

### 1. Savage

Plaintiff does not challenge the independence or disinterestedness of Savage who joined the Board after the Challenged Transactions.  In this regard, Savage stands alone.

### 2. Edens

Plaintiff contends that Edens is interested in the Challenged Transactions and lacks independence from Fortress.  Defendants do not seriously dispute Edens'

---

[157] *In re Ezcorp, Inc. Consulting Agmt. Deriv. Litig.*, 2016 WL 301245, at *34 (Del. Ch. Jan. 25, 2016); *id.* ("If the board of directors lacks a majority comprising independent and disinterested directors, then demand is futile.").

[158] *See, e.g.*, *Sandys v. Pincus*, 152 A.3d 124, 128–29 (Del. 2016) ("For many years, this Court and the Court of Chancery have advised derivative plaintiffs to take seriously their obligations to plead particularized facts justifying demand excusal.  This case presents the unusual situation where a plaintiff who sought books and records to plead his complaint somehow only asked for records relating to the transaction he sought to redress and did not seek any books and records bearing on the independence of the board. . . .  As a result of the plaintiff's failure, he made the task of the Court of Chancery more difficult than was necessary and hazarded an adverse result for those he seeks to represent."); *Brehm*, 746 A.2d at 266–67 (describing the "tools at hand" available to a stockholder to assist in pleading particular facts to demonstrate demand futility).

35

conflicts, nor could they. Edens is Fortress' founder, one of its principals and the co-chairman of its board of directors.[159] He is Fortress' largest stockholder and is responsible for Fortress' private equity and publicly traded alternative investment businesses (including Holiday and New Senior).[160] Additionally, while it appears that Edens recused himself from voting on the Acquisition, he was one of two members on the Pricing Committee that set the terms and pricing for the Secondary Offering used to finance the Acquisition and under which both FIG and Edens himself received share options. Thus, Plaintiff has adequately pled facts raising a reasonable doubt that Edens could have independently considered a demand challenging these transactions.

### 3. Givens

Here again, Defendants do not earnestly dispute Givens' lack of independence and disinterest for purposes of the Rule 23.1 analysis.[161] Givens was the second member of the Pricing Committee setting the terms for the Secondary Offering and she also received options under the Secondary Offering. Moreover, she was employed by Fortress and yet was New Senior's lead negotiator for the

---

[159] Compl. ¶ 37.

[160] Compl. ¶¶ 37–38; Defs.' Opening Br. 24 n.10.

[161] Tr. 44:9–14.

36

Acquisition.[162]  Because she stood on both sides of the Challenged Transactions, it is reasonable to infer on that basis alone that she was interested in the Challenged Transactions.  Accordingly, Plaintiff has satisfied his burden to raise a reasonable doubt regarding Givens' ability objectively to consider a demand.

### 4. Malone

Plaintiff challenges Malone's fitness to consider a demand on both interest and independence grounds.  Malone is alleged to be interested in the Challenged Transactions because, as a director of both Walker & Dunlop, which stood to lend $464.7 million to New Senior to help fund the Acquisition, and the borrower, New Senior, Malone also stood on both sides of the transaction.[163]  The Complaint alleges that Walker & Dunlop has provided financing to New Senior in the past and that New Senior's loans "constituted approximately 17.4% of [Walker & Dunlop's] Freddie Mac loan origination volume in 2015."[164]  It goes on to allege that, in April 2015, Walker & Dunlop "closed on the largest deal in its 77 year history— originating $670 million in loans to New Senior."[165]  Finally, the Complaint alleges

---

[162] It is also alleged that Givens was further motivated to favor the Challenged Transactions because she holds stock in the Fortress funds that own Holiday.  Compl. ¶ 41.

[163] Compl. ¶ 50; Pl.'s Answering Br. 26.

[164] Compl. ¶ 49.

[165] Compl. ¶ 48.

that Walker & Dunlop expected to enjoy a continuing relationship with New Senior that would lead to further lucrative investments.[166]  Viewing these pled facts together, it is reasonably conceivable that Walker & Dunlop had a material interest in providing the $464.7 million loan to finance the Acquisition.[167]  Thus, Plaintiff has raised a reasonable doubt as to whether Malone, as a director of Walker & Dunlop, was disinterested in the Challenged Transactions.  Malone was a dual fiduciary here and the interests of the beneficiaries he served (lender vs. borrower) were not aligned.[168]  Accordingly, Plaintiff has adequately pled that Malone was "interested" for demand futility purposes.[169]

---

[166] Compl. ¶¶ 48–49.

[167] Plaintiff also points to other conflicts affecting Malone that relate principally to his prior service on the Fortress board of directors and as a managing director for Fortress, his current ownership of substantial Fortress stock and the substantial, material director fees he earns from Fortress board placements.  Compl. ¶¶ 44, 50; Pl.'s Answering Br. 30.  Although I need not take up these alleged conflicts given my findings relating to Malone's service on the Walker & Dunlop board, I do note that, in totality, the weight of the pled facts regarding these conflicts is substantial.

[168] *See Chester Cty.*, 2016 WL 5865004, at *10 ("Plaintiff has alleged particularized facts sufficient to create a reasonable doubt as to Edens, Jacobs, and Nierenberg's disinterestedness in the HLSS transactions because of their dual fiduciary positions at Fortress and New Residential."); *Chen v. Howard-Anderson*, 87 A.3d 648, 670 (Del. Ch. 2014) ("If the interests of the beneficiaries to whom the dual fiduciary owes duties diverge, the fiduciary faces an inherent conflict of interest."); *In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, at *29–30 (Del. Ch. Sept. 4, 2014) (describing the so-called "dual-fiduciary problem"); *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983) ("There is no 'safe harbor' for such divided loyalties in Delaware.").

[169] *See Chester Cty.*, 2016 WL 5865004, at *9 ("When a director of a corporation owes fiduciary duties as a director or officer of another corporation, the director is conflicted for purposes of the first prong of *Aronson*. . . ."); *Kahn v. Portnoy*, 2008 WL 5197164, at *7

### 5. Van der Hoof Holstein

Plaintiff challenges Van der Hoof Holstein's fitness to consider a demand based on her especially close ties to Edens. Van der Hoof Holstein is employed in a leadership position at PIH, a non-profit organization where Edens' wife has for many years served on the board of directors and to which the Edens family makes substantial financial and other contributions.[170] To illustrate the close connection, Plaintiff points to the fact that Edens' daughter wore her self-described "lucky" PIH pin while appearing on national television at the NBA draft as a representative of her father (and the NBA team he owns). He also highlights Edens' hands-on support of PIH's relief efforts in Haiti; support that was praised by Van der Hoof Holstein's immediate supervisor in several publications.[171] These close ties are further revealed

---

(Del. Ch. Dec. 11, 2008) ("Portnoy, as a director of HPT and TA, is therefore bound to act in the best interest of both companies. Thus, when Portnoy acted on behalf of TA in approving the transaction, his loyalties as an HPT director raise at least a reasonable doubt as to whether he was acting in the best interest of TA.").

[170] Compl. ¶¶ 53–54. The Complaint alleges that "[t]he Edens family has donated between $100,000 and $1,000,000 to PIH every fiscal year from 2008–2012 and in 2015." Compl. ¶ 54.

[171] Compl. ¶¶ 55–58. Van der Hoof Holstein's direct supervisor is Dr. Paul Farmer, the founder of PIH. Compl. ¶ 56. The recognition in a Van der Hoof Holstein-edited book was with respect to Edens' connection to GHDP. Compl. ¶ 58. "GHDP is a partnership between [the Department of Global Health and Social Medicine] and PIH that trains healthcare professionals to deliver medical care to destitute populations worldwide." Compl. ¶ 57. Van der Hoof Holstein is not listed as an employee on the GHDP website (Dr. Farmer is) but her connection to and position as Associate Director of GHDP does not appear to be contested. *See* Klein Aff. Ex. 4 (2015 Proxy Statement), at 8. The Complaint further supports the claim of strong ties by reference to a comment by Chelsea Clinton in

in the fact that Van der Hoof Holstein serves alongside Edens on several boards, including A&K (an organization founded by Fortress).[172] The compensation for her board service, as facilitated by Edens, amounts to at least half of her annual income.[173]

This court has considered on several occasions the extent to which charitable donations to a cause associated with a director made by an interested individual or entity might serve as a basis to reasonably doubt whether the director was beholden to the interested donor. Defendants rely primarily on this court's analysis of the issue in *In re Goldman Sachs*[174] and *In re J.P. Morgan Chase*[175] to support their argument that Edens' charitable contributions to PIH do not raise a reasonable doubt regarding Van der Hoof Holstein's independence. In *Goldman Sachs*, a member of

---

2015 acknowledging that the "Edens'[] extraordinary support for PIH's work in Haiti, include[ed] traveling to Haiti with Dr. Paul Farmer (PIH's founder and [Van der] Hoof Holstein's boss) and Clinton." Compl. ¶ 56.

[172] Compl. ¶ 59.

[173] Compl. ¶ 59. "According to PIH's publicly available Form 990 tax returns, Hoof Holstein earned $72,500 from PIH in 2013, $106,002 from PIH in 2014, and $149,855 from PIH in 2015, for working 60 hours a week. Hoof Holstein therefore receives at least half of her income from her New Senior Board service. It is also reasonable to infer that Hoof Holstein receives similar compensation from A&K Global Health, which means that the vast majority of her compensation comes through her service on Fortress-affiliated boards with Edens." *Id.*

[174] 2011 WL 4826104 (Del. Ch. Oct. 12, 2011).

[175] *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808 (Del. Ch. 2005).

40

the company's board was also the chair of a $100 million renovation campaign for a charitable organization and a trustee of the University of Chicago where part of his responsibilities also included raising money.[176]  The plaintiffs alleged that the company made contributions to the renovation campaign as well as to the university.[177]  The court determined that the allegations failed to raise a reasonable doubt regarding the director's independence when

> nothing more can be inferred from the complaint than the facts that the Goldman Foundation made donations to a charity that Bryan served as trustee, that part of Bryan's role as a trustee was to raise money, and that Goldman made donations to another charity where Bryan chaired a renovation campaign.  The Plaintiffs do not allege that Bryan received a salary for either of his philanthropic roles, that the donations made by the Goldman Foundation or Goldman were the result of active solicitation by Bryan, or that Bryan had other substantial dealings with Goldman or the Goldman Foundation. The Plaintiffs do not provide the ratios of the amounts donated by Goldman, or the Goldman Foundation, to overall donations, or any other information demonstrating that the amount would be material to the charity. Crucially, the Plaintiffs fail to provide any information on how the amounts given influenced Bryan's decision-making process.[178]

In *J.P. Morgan*, the court found the allegations of conflict similarly lacking. The plaintiff there challenged several directors' independence based on the defendant company's donations to two organizations (the American Natural History

---

[176] 2011 WL 4826104, at *8.

[177] *Id.*

[178] *Id.* at *9.

41

Museum and the United Negro College Fund) at which the directors held various positions, including president, trustee and CEO.[179] The court found that the complaint lacked any indication that the contributions to the respective non-profits were of import to the directors or how the donations would affect the directors' decision making.[180]

For his part, Plaintiff cites to *In re Oracle*[181] and *Delaware County Employees Retirement Fund v. Sanchez*.[182] In *Oracle*, then-Vice Chancellor Strine analyzed the independence of a two-person special litigation committee that had moved to dismiss a derivative action.[183] The committee members were both tenured professors at Stanford who were tasked with investigating claims of insider trading against other directors on the company's board. The court found the following ties to exist between the targets of the committee's investigation and Stanford: one director was also a professor at Stanford who had taught one of the committee members; another was a Stanford alumnus who had directed millions of dollars of donations over the

---

[179] 906 A.2d at 814–15.

[180] *Id.* at 822–23.

[181] 824 A.2d 917 (Del. Ch. 2003).

[182] 124 A.3d 1017, 1022 (Del. 2015) (finding a pleading sufficient to raise a reasonable doubt as to director independence when the pled facts alleged that the director had been friends with the interested director for over fifty years and that friendship had resulted in economic advantages (including full-time employment) for the director).

[183] 824 A.2d 917.

years to Stanford; and the third was the company's CEO who donated millions of dollars to Stanford through a personal foundation.[184] The court concluded that "the ties among the [committee], the Trading Defendants, and Stanford are so substantial that they cause reasonable doubt about the [committee]'s ability to impartially consider whether the Trading Defendants should face suit."[185] The court reached this conclusion by applying a "contextual approach," explaining:

> Delaware law should not be based on a reductionist view of human nature that simplifies human motivations on the lines of the least sophisticated notions of the law and economics movement. Homo sapiens is not merely homo economicus. We may be thankful that an array of other motivations exist that influence human behavior; not all are any better than greed or avarice, think of envy, to name just one. But also think of motives like love, friendship, and collegiality, think of those among us who direct their behavior as best they can on a guiding creed or set of moral values.
>
> Nor should our law ignore the social nature of humans. To be direct, corporate directors are generally the sort of people deeply enmeshed in social institutions. Such institutions have norms, expectations that, explicitly and implicitly, influence and channel the behavior of those who participate in their operation.[186]

In my view, *Oracle* is the more fitting and persuasive authority here. Plaintiff has pled that Van der Hoof Holstein is employed by, and has a leadership role in, a relief organization that clearly derives substantial support, both financial and

---

[184] *Id.* at 920–21.

[185] *Id.* at 942.

[186] *Id.* at 938.

devotional, from the Edens family through considerable donations, aide in relief efforts and service on its board. Plaintiff's failure to quantify precisely the contributions made by the Edens family, as argued by Defendants, does not undercut the particularized pleading that their support is significant to PIH, Van der Hoof Holstein's main employer, and to Van der Hoof Holstein.[187] The fact that Plaintiff does not allege that Van der Hoof Holstein actually solicited the donations or the other support provided by the Edens family to PIH does not dilute their relevance to the "independence" analysis.[188] When the Edens family's ties to PIH are coupled with the substantial and clearly material director fees Van der Hoof Holstein receives from service on boards at the behest of Edens, I am satisfied that these allegations raise reasons to doubt Van der Hoof Holstein's independence from Edens.

---

[187] Defs.' Opening Br. 27–28 ("Plaintiff has failed to allege how donations amounting to less than 1% of PIH's annual revenue would affect the decision-making of Ms. van der Hoof Holstein.").

[188] Defs.' Opening Br. 24, 28 ("Plaintiff has not alleged that Ms. van der Hoof Holstein's role at PIH had anything to do with fundraising, let alone that she personally solicited the Edens family donations."). *See In re Limited, Inc.*, 2002 WL 537692, at *4 (Del. Ch. Mar. 27, 2002) ("The Court in ascertaining the sufficiency of a complaint challenging a director's loyalty does not apply an objective reasonable director standard; instead, the Court must apply a subjective actual person test to determine whether a particular director lacks independence because he is controlled by another.") (internal quotation omitted); *McMullin v. Beran*, 765 A.2d 910, 923 (Del. 2000) ("In assessing director independence, Delaware courts apply a subjective 'actual person' standard to determine whether a 'given' director was likely to be affected in the same or similar circumstances.").

With that conclusion, I have determined that a majority of the seven directors that would have considered a demand from Plaintiff are in some way conflicted. Thus, I could stop the *Aronson* analysis here. For the sake of completeness, however, I will address the independence of both Colbert and McFarland as well.

### 6. Colbert

The thrust of Plaintiff's allegations with respect to Colbert is that there is reason to doubt his independence from Edens after Edens invited Colbert to join the Milwaukee Bucks ownership group, a unique, prestigious and lucrative opportunity available, by NBA rule, to no more than 750 people in the world.[189] In return for this invitation, Colbert, through Partners for Community Impact, LLC, assisted Edens and the City of Milwaukee in their efforts to build a new arena in downtown Milwaukee.[190] This connection, according to Plaintiff, creates such "a special and highly unusual financial and social relationship because of the prestige associated with an ownership stake" that Colbert could not be expected to act against Edens'

---

[189] Compl. ¶¶ 60–61. According to the Complaint, NBA rules limit team ownership groups to 25 individuals, each of whom must own at least 1% of the team. Compl. ¶ 60. Thus, it is alleged that it is unlikely that Colbert would have the opportunity to "become an owner of another team if Edens, as the team's dominant partner, decided to squeeze Colbert out of the [Bucks] ownership group." Pl.'s Answering Br. 38.

[190] Compl. ¶ 62.

interests, especially given that Colbert joined Edens' Bucks ownership group around the same time he joined the New Senior Board.[191]

Plaintiff likens the Bucks ownership connection between Edens and Colbert to the unique relationship at issue in *Sandys v. Pincus*.[192] In *Pincus*, our Supreme Court found that a derivative plaintiff had raised a reasonable doubt regarding a director's independence by pleading that the interested director's family and the family of the challenged director owned a private plane together.[193] The Court based its finding on the fact that "[c]o-ownership of a private plane involves a partnership in a personal asset that is not only expensive, but also requires close cooperation in use, which is suggestive of detailed planning indicative of a continuing, close personal friendship."[194] Such close relationships, the Court explained, would be expected "to heavily influence a human's ability to exercise impartial judgment."[195]

---

[191] Compl. ¶ 61. The Complaint does not say much about the financial rewards Colbert has received or might expect to receive from his ownership interest in the Bucks. It only alleges that the "relationship is . . . lucrative" and that other investors have "reaped a 25-fold gain on [their] investment[s]." *Id.* The real thrust of the Complaint, and Plaintiff's futility argument, is that Edens invited Colbert to join an exclusive and highly rewarding "club" that Colbert likely would not have had access to but for Edens' generosity. Compl. ¶ 62.

[192] 152 A.3d 124 (Del. 2016).

[193] *Id.* at 130.

[194] *Id.*

[195] *Id.*

Defendants argue that the relationship Plaintiff has proffered here is nothing like the one presented in *Pincus*. Colbert is a co-owner of a sports team with Edens, along with several others. According to Defendants, this business relationship does not evidence the kind of close friendship or personal relationship that can reasonably be inferred when individuals own a private plane together.

I agree with Defendants that the relationship dynamics are different. There is likely little or no planning required between Edens and Colbert to ensure that the Bucks continue to operate successfully as an NBA franchise.[196] But that does not mean the dynamics of joining together to own a professional sports team are any less revealing of a unique, close personal relationship. Edens invited Colbert to join him in a relatively small group of investors who would own a highly unique and personally rewarding asset. In return, Colbert assisted Edens in the effort to build a new arena for the team they now co-owned. I am satisfied that this relationship creates a reason to believe that Colbert "may feel . . . beholden to [Edens]."[197]

---

[196] *Id.* (emphasizing the planning and coordination required to own a private plane together). For example, I suspect that Colbert and Edens collectively have absolutely nothing to do with whether the "Greek freak" remains healthy, happy, productive and a major draw for Bucks fans. *See* http://www.espn.com/nba/player/_/id/3032977/giannis-antetokounmpo (a.k.a., the "Greek freak," number 34 in your Bucks program).

[197] *Pincus*, 152 A.3d at 128.

### 7. McFarland

As for the final director, McFarland, the Complaint alleges that he serves on the board of Drive Shack, where he was placed as a Fortress designee alongside Edens, and that he receives 60% of his publicly reported income from his service on Fortress-affiliated boards.[198] The Complaint further characterizes as "telling" the fact that McFarland lists his address for purposes of investment activities as "C/O Fortress Investment Group."[199]

Plaintiff's allegations concerning McFarland's lack of independence are more scant than those pled regarding the other directors. As I review these allegations, I am reminded that, in *Sanchez*, our Supreme Court observed that "[d]etermining whether a plaintiff has pled facts supporting an inference that a director cannot act independently of an interested director for purposes of demand excusal . . . can be difficult."[200] While a close call, I am satisfied that there is reason to doubt McFarland's independence. In so finding, I acknowledge that our law is settled that service on another board alongside the interested director, alone, is insufficient to

---

[198] Compl. ¶ 63. "Fortress and Edens, with and through their affiliates, own approximately 8% of Drive Shack's outstanding stock, and Fortress is the manager of Drive Shack." *Id.*

[199] Compl. ¶ 63.

[200] *Sanchez*, 124 A.3d at 1019.

raise a reasonable doubt as to a director's independence,[201] especially when the interested director does not control either company.[202] But there is more pled here.

McFarland is a director of New Senior and Drive Shack, both of which are managed by Fortress. He was placed on these boards by Fortress and serves on both of them alongside Edens. Based on public filings, McFarland receives 60% of his publicly reported income from Fortress-managed companies.[203] And he lists his address on SEC Form 4s (for investments unrelated to Fortress) as "C/O Fortress." Weighing the totality of these facts, there is reason to doubt whether McFarland's material ties with Fortress and Edens would affect his ability independently to evaluate a demand to bring claims against them.[204]

---

[201] *See, e.g.*, *Highland Legacy Ltd. v. Singer*, 2006 WL 741939, at *5 (Del. Ch. Mar. 17, 2006) (finding that allegations of service on the boards of different companies alongside one another only provides a "naked assertion of a previous business relationship [that] is not enough to overcome the presumption of a director's independence").

[202] Compl. ¶ 63.

[203] Compl. ¶ 63.

[204] *See, e.g.*, *Portnoy*, 2008 WL 5197164, at *8 ("The complaint alleges similar facts with respect to Gilmore and Donelan. Gilmore is a director of TA and FVE. For 2007, she was paid $89,480 in fees as a director of TA and $70,940 in fees as a director of FVE, compensation the complaint alleges is material to Gilmore because it exceeds the compensation from her position as a clerk in the United States Bankruptcy Court. Gilmore also worked at Sullivan & Worcester LLP from 1993 to 2000, during part of which time Portnoy was a partner and chairman of the firm. Donelan is a director of TA and a trustee of HRPT and the ILC. In 2007, Donelan was paid $88,980 in fees as a director of TA and $73,600 in fees as a trustee of HRPT."); *In re Ply Gem Indus., Inc. S'holders Litig.*, 2001 WL 1192206, at *1 (Del. Ch. Oct. 3, 2001) ("past benefits conferred . . . may establish an

49

\* \* \* \* \* \* \* \*

Plaintiff has pled sufficient facts to raise a reasonable doubt regarding the disinterestedness and independence of the majority of the New Senior Board such that demand would have been futile under the first prong of *Aronson*. I need not and decline to address *Aronson*'s second prong.[205] The motion to dismiss under Court of Chancery Rule 23.1 is denied.

## B. Plaintiff Has Stated Viable Claims Against the Board and Givens as Officer

Rule 12(b)(6) imposes a "less stringent" pleading standard than Rule 23.1.[206] "Thus, a complaint that survives a motion to dismiss pursuant to Rule 23.1 also will survive a 12(b)(6) motion to dismiss, 'assuming that it otherwise contains sufficient facts to state a cognizable claim.'"[207] "The standards governing a motion to dismiss for failure to state a claim are well settled: (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are 'well-pleaded' if they give the

---

obligation or debt (a sense of 'owingness') upon which a reasonable doubt as to a director's loyalty to a corporation may be premised").

[205] *See Cambridge*, 2014 WL 2930869, at \*6 (finding demand futility under the first prong of *Aronson* and, therefore, declining to consider the second prong); *TVI Corp. v. Gallagher*, 2013 WL 5809271, at \*10 (Del. Ch. Oct. 28, 2013) (same); *Limited*, 2002 WL 537692, at \*7 (same).

[206] *TVI Corp.*, 2013 WL 5809271, at \*12.

[207] *Id.*

opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[208]

Plaintiff's claims sound in breach of fiduciary duties. As this court explained in *Frederick Hsu*:

> when determining whether directors breached their fiduciary duties, Delaware corporate law distinguishes between the standard of conduct and the standard of review. The standard of conduct describes what directors are expected to do and is defined by the content of the duties of loyalty and care. The standard of review is the test that a court applies when evaluating whether directors have met the standard of conduct.[209]

With this distinction in mind, a logical approach to analyzing the breach of fiduciary duty claims is to "work[] through the standard of conduct, apply[] a standard of review, and then determin[e] whether the defendants have properly invoked any immunities or defenses, such as exculpation."[210] I follow that approach here.

---

[208] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002).

[209] *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *15 (Del. Ch. Apr. 24, 2017).

[210] *Id.*

51

### 1. The Standard of Conduct

"In performing their duties the directors [of Delaware corporations] owe fundamental fiduciary duties of care and loyalty."[211] "[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."[212] Thus, "Delaware law is clear that the board of directors of a for-profit corporation . . . must, within the limits of its legal discretion, treat stockholder welfare as the only end, considering other interests only to the extent that doing so is rationally related to stockholder welfare."[213]

Plaintiff has alleged that the Board defendants caused New Senior to pay more than was reasonable for the Holiday Portfolio to advance the interests of Fortress and Edens at the expense of New Senior and its stockholders.[214] Accepted as true,

---

[211] *Polk v. Good*, 507 A.2d 531, 536 (Del. 1986).

[212] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993). Plaintiff alleges that the Board defendants breached both their duty of care and duty of loyalty. I focus on the duty of loyalty allegations, however, because, as discussed below, Defendants have invoked a Section 102(b)(7) defense that would exculpate them from liability for breaches of the duty of care.

[213] Leo E. Strine, Jr., *A Job Is Not a Hobby: The Judicial Revival of Corporate Paternalism and Its Problematic Implications*, 41 J. Corp. L. 71, 107 (2015).

[214] Compl. ¶¶ 4–10, 109, 111, 128, 150.

these allegations describe the kind of self-dealing transaction that gives rise to a classic breach of the duty of loyalty claim.[215]

## 2. The Standard of Review

As is often the case at the pleadings stage, much ink has been spilled by the parties to express their competing views regarding the applicable standard of review.[216] Plaintiff argues that his claims implicate entire fairness review because the Challenged Transactions were interested transactions. Accordingly, given the heightened scrutiny with which the Court must review his claims, he maintains that the Court cannot adjudicate them on a motion to dismiss under Rule 12(b)(6).[217]

Not surprisingly, Defendants argue that the Court should review Plaintiff's claims under the business judgment rule. They maintain that the Complaint, at best,

---

[215] *See, e.g.*, *Chen*, 87 A.3d at 671 ("Delaware cases recognize that liquidity is one benefit that may lead directors to breach their fiduciary duties, and stockholder directors may be found to have breached their duty of loyalty if a desire to gain liquidity caused them to manipulate the sale process and subordinate the best interests of the corporation and the stockholders as a whole.") (internal quotation omitted); *Rales v. Blasband*, 634 A.2d 927, 935 (Del. 1993) (explaining that allegations that the company's board decided to buy "junk bonds" for the sole benefit of two directors "who were acting in furtherance of their business relationship" with the company issuing the bonds would, if proven true, constitute a breach of the duty of loyalty); *Carsanaro v. Bloodhound Technologies, Inc.*, 65 A.3d 618, 659 (Del. Ch. 2013) (finding a breach of the duty of loyalty alleged where directors had participated in financing rounds at favorable terms explaining that "each financing challenged in the complaint was a self-interested transaction implicating the duty of loyalty and raising an inference of expropriation").

[216] *See Larkin v. Shah*, 2016 WL 4485447, at *7 (Del. Ch. Aug. 25, 2016) (characterizing the determination of the appropriate standard of review as the "gating question").

[217] Pl.'s Answering Br. 62.

53

pleads facts that would allow a reasonable inference that only Edens, Givens and perhaps Malone were interested in the Challenged Transactions. Thus, because a majority of the Transaction Committee was disinterested, the Challenged Transactions fit within the safe harbor codified in 8 *Del. C.* § 144(a)(1) and, therefore, the business judgment rule applies. Moreover, they maintain that, even without the safe harbor, "[t]o invoke entire fairness [at the pleading stage], in the absence of a controlling shareholder, Plaintiff would need to allege that a *majority of the board* was interested in the [Challenged Transactions] or beholden to an interested party."[218] Since the Complaint pleads neither factual predicate (majority interest or lack of independence) for entire fairness review, the business judgment presumption must apply. I disagree on both counts.

### a. Section 144

Defendants' Section 144(a)(1) argument catenates along the following analytical tree: (i) under Supreme Court precedent, approval by a majority of disinterested directors under Section 144(a)(1) triggers review under the business judgment rule; (ii) for purposes of applying the safe harbor of Section 144(a)(1), the Court should consider only whether directors are interested in the transaction, and should not be concerned with whether the majority of the board is also independent;

---

[218] Defs.' Opening Br. 43 (citing *Orman*, 794 A.2d at 23) (emphasis in the original).

and (iii) since Plaintiff has only challenged three directors on grounds they were interested in the Challenged Transactions, the majority of the Board met the requirements of Section 144(a)(1) and their decisions must, therefore, be protected as valid business judgments.[219]  In support of this argument, Defendants rely principally upon *Benihana of Tokyo, Inc. v. Benihana, Inc.,* decided by our Supreme Court in 2006.[220]  There, applying Section 144(a)(1), the Court stated "[a]fter approval by disinterested directors, courts review the interested transaction under the business judgment rule . . . ."[221]

Our case law interpreting Section 144(a)(1) is murky at best.  A search of one's favorite legal research site would yield cases that appear to support the view that Section 144(a)(1)'s safe harbor works as Defendants suggest.[222]  That same

---

[219] Defs.' Opening Br. 51 ("[R]egardless of whether any of the four directors who approved the Acquisition were not independent, they are disinterested in the Acquisition, and the Amended Complaint should be dismissed.").

[220] *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 906 A.2d 114 (Del. 2006) ("*Benihana II*").

[221] *Id.* at 120.

[222] *See, e.g., Sutherland v. Sutherland*, 2009 WL 857468, at *4 n.13 (Del. Ch. Mar. 23, 2009) ("Notably, before the law related to Section 144 of the DGCL finally settled, *see, e.g.*, *Benihana II*, 906 A.2d at 120 (stating that interested director transactions approved pursuant to the 144(a)(1) safe harbor are reviewed under the business judgment rule), it was frequently suggested that Section 144 . . . did no more than to remove a director's disability to participate in a quorum to vote on an interested transaction, but did nothing to sanitize such a transaction if it was inherently unfair."); *Oberly v. Kirby*, 592 A.2d 445, 466 (Del. 1991) ("The enactment of 8 *Del. C.* § 144 in 1967 limited the stockholders' power in two ways.  First, section 144 allows a committee of disinterested directors to approve a transaction and bring it within the scope of the business judgment rule.  Second, where an independent committee is not available, the stockholders may either ratify the

55

search, however, would yield several cases, even post-*Benihana II*, where our courts have viewed Section 144(a)(1) much more narrowly.[223]

To put *Benihana II* in context, it is useful to review the decision of this court in *Benihana I* that was affirmed. In clarifying the interaction between Section 144(a)(1) and the common law business judgment rule, this court explained:

transaction or challenge its fairness in a judicial forum, but they lack the power automatically to nullify it. When a challenge to fairness is raised, the directors carry the burden of establishing the transaction's entire fairness, sufficient to pass the test of careful scrutiny by the courts.").

[223] *See Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 185 (Del. Ch. 2005) ("*Benihana I*"), *aff'd*, 906 A.2d 114 (Del. 2006) ("While I find that the Benihana Board's approval of the BFC Transaction meets the requirements of 8 Del. C. § 144(a)(1), that section merely protects against invalidation of a transaction "solely" because it is an interested one. . . . Because BOT also contends that the Director Defendants breached their fiduciary duties of loyalty and care, my analysis does not end with the "safe harbor" provisions of § 144(a)."); *Khanna v. McMinn*, 2006 WL 1388744, at *25 n.201 (Del. Ch. May 9, 2006) (same); *Cinemara*, 662 A.2d at 1169 (same); *Valeant Pharm. Int'l v. Jerney*, 921 A.2d 732, 745 (Del. Ch. 2007) ("Before the 1967 enactment of 8 *Del. C.* § 144, a corporation's stockholders had the right to nullify an interested transaction. To ameliorate this potentially harsh result, section 144 as presently enacted provides three safe harbors to prevent nullification of potentially beneficial transactions simply because of director self-interest. First, section 144 allows a committee of disinterested directors to approve a transaction and, at least potentially, bring it within the scope of the business judgment rule."); *Zimmerman v. Crothall*, 2012 WL 707238, at *18 (Del. Ch. Mar. 5, 2012) ("As the Delaware Supreme Court observed in *Fliegler v. Lawrence*, § 144 'merely removes an interested director cloud when its terms are met and provides against invalidation of an agreement solely because such a director . . . is involved.' That is, the statute only addresses the void or voidable issue presented by the common law before the 1967 amendments to the Delaware General Corporation Law. Thus, it does not appear that either 8 *Del. C.* § 144 or § 6.13 of the Operating Agreement, which is based on § 144, was intended to address the common law rules for liability for breach of fiduciary duty. Therefore, even if Defendants have complied with § 6.13, that would not operate as a safe harbor against review of the challenged transactions under the entire fairness standard.") (internal citation omitted).

Satisfying the requirements of § 144 only means that the BFC Transaction is not void or voidable solely because of the conflict of interest.

While non-compliance with §§ 144(a)(1), (2)'s disclosure requirement by definition triggers fairness review rather than business judgment rule review, the satisfaction of §§ 144(a)(1) or (a)(2) alone does not always have the opposite effect of invoking business judgment rule review. Rather, satisfaction of §§ 144(a)(1) or (a)(2) simply protects against invalidation of the transaction "solely" because it is an interested one. As such, § 144 is best seen as establishing a floor for board conduct but not a ceiling. Thus, equitable common law rules requiring the application of the entire fairness standard on grounds other than a director's interest still apply.

After determining that the defendant board members had guided the interested transaction into Section 144(a)(1)'s safe harbor, and that the transaction, therefore, would not be voided, Vice Chancellor Parsons proceeded to address the plaintiff's allegations that the directors breached their fiduciary duties by applying common law standards. He ultimately concluded that none of the directors had breached their duty of loyalty because the majority of the directors that approved the transaction were disinterested *and* independent and the Board did not enter into the transaction for an improper purpose.[224]

Several commentators and judges, post-*Benihana II*, have similarly articulated the difference between the oft-confused Section 144(a) safe harbors and the common law our courts apply to determine the appropriate standard of review

---

[224] *Benihana I*, 891 A.2d at 191.

57

by which to adjudicate a challenge to an interested transaction. A particularly cogent expression of the distinction (and the confusion) can be found in *Finding Safe Harbor: Clarifying the Limited Application of Section 144*, where the authors explain:

> section 144(a)(1) provides that a covered transaction will not be void or voidable solely as a result of the offending interest if it is approved by an informed majority of the disinterested directors, even though the disinterested directors be less than a quorum. Under the section 144 statutory analysis, so long as there is one informed, disinterested director on the board, and so long as he or she approves the transaction in good faith, the transaction will not be presumptively voidable due to the offending interest. In other words, a nine-member board with a single disinterested director may approve a covered transaction and reap the benefits of the section 144 safe harbor.
>
> Under the common law, however, the factor is somewhat different; approval must be by a disinterested majority of the entire board. That is, a plaintiff may rebut the presumption of the business judgment rule by showing that a majority of the individual directors were interested or beholden. In the common-law analysis, therefore, a transaction approved by the nine-member board discussed above (with the single disinterested director) will be subject to the entire-fairness standard. The standards are phrased similarly for the statutory and common-law analyses, but they are in fact quite different.[225]

---

[225] Blake Rohrbacher, John Mark Zeberkiewicz & Thomas A. Uebler, *Finding Safe Harbor: Clarifying the Limited Application of Section*, *144*, 33 Del. J. Corp. L. 719, 737–38 (2008). *See also* R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations*, § 4.16 (3d ed. 2018) ("Apart from the statutory safe-harbor analysis, the courts also scrutinize interested-director transactions under a common-law fiduciary review. This fiduciary review involves factors similar—though not quite identical—to those under Section 144. That is, approval by a disinterested majority of the board or disinterested stockholders may revive the presumptions of the business judgment rule. Otherwise, the courts will use the entire-fairness standard to scrutinize the transaction."); Leo E. Strine, Jr., Lawrence A. Hamermesh, R. Franklin Balotti & Jeffrey M. Gorris, *Loyalty's Core Demand: The Defining Role of Good Faith in*

Based on the plain language of the statute,[226] and my reading of the persuasive authority on the subject, I am satisfied that compliance with Section 144(a)(1) does not *necessarily* invoke business judgment review of an interested transaction. The Court must still adhere to settled common law principles when fixing the appropriate standard of review by which fiduciary conduct should be measured.[227]

---

*Corporation Law*, 98 Geo. J.L. 629, 656–57 & n.85 (2010) ("The question of whether section 144 was intended to create a safe harbor from equitable review if its provisions obviating a statutory fairness burden were met is controversial. . . . To date, the Delaware courts have generally read the statute more narrowly, while drawing on it in crafting rulings in equity.") (citing *In re Cox Commc'ns, Inc. S'holders Litig.*, 879 A.2d 604, 614–15 (Del. Ch. 2005)); *Zimmerman*, 2012 WL 70723, at *18; *Valeant*, 921 A.2d at 745.

[226] 8 *Del. C.* § 144:

> (a) ***No contract or transaction*** between a corporation and 1 or more of its directors or officers, or between a corporation and any other corporation, partnership, association, or other organization in which 1 or more of its directors or officers, are directors or officers, or have a financial interest, ***shall be void or voidable solely for this reason***, or solely because the director or officer is present at or participates in the meeting of the board or committee which authorizes the contract or transaction, or solely because any such director's or officer's votes are counted for such purpose, if. . . .

(emphasis supplied).

[227] *Benihana I*, 891 A.2d at 191 ("No safe-harbor exists for divided loyalties in Delaware."). I acknowledge that some read our case law as holding that compliance with Section 144 safe harbors justifies a burden-shift in the entire fairness analysis. While I cannot say that I share that view of our law, I need not weigh in on that issue at this stage of the proceedings. *See* Edward P. Welch, Robert S. Saunders, Allison L. Land & Jennifer C. Voss, *Folk on the Delaware General Corporation Law*, § 144.02 (6th ed. 2018) (citing *Cooke v. Oolie*, 1997 WL 367034, at *9 (Del. Ch. June 23, 1997) ("It is now clear that even if a board's action falls within the safe harbor of Section 144, the board is not entitled to

### b. The Majority of the Board Was Interested In the Challenged Transactions or Not Independent

In *Orman v. Cullman*, Chancellor Chandler succinctly laid out the pathway to overcoming the business judgment presumption at the pleading stage by alleging that the Board acted out of self-interest or with allegiance to interests other than the stockholders':

> As a general matter, the business judgment rule presumption that a board acted loyally can be rebutted by alleging facts which, if accepted as true, establish that the board was either interested in the outcome of the transaction or lacked the independence to consider objectively whether the transaction was in the best interest of its company and all of its shareholders. To establish that a board was interested or lacked independence, a plaintiff must allege facts as to the interest and lack of independence of the individual members of that board. To rebut successfully business judgment presumptions in this manner, thereby leading to the application of the entire fairness standard, a plaintiff must normally plead facts demonstrating that a majority of the director defendants have a financial interest in the transaction or were dominated or controlled by a materially interested director.[228]

"If a director-by-director analysis leaves insufficient [independent] directors to make up a board majority, then the court will review the board's decision for entire fairness."[229]

---

receive the protection of the business judgment rule. Compliance with Section 144 merely shifts the burden to the plaintiffs to demonstrate that the transaction was unfair.")).

[228] *Orman*, 794 A.2d at 22–23 (later explaining that interest can also be shown by a director standing on both sides of a transaction).

[229] *Frederick Hsu*, 2017 WL 1437308, at *26.

As noted, the Complaint alleges that a majority of the New Senior directors approved the self-dealing Acquisition at an excessive price, allowed New Senior to issue stock to finance the Acquisition at an unreasonable discount, declined to exercise their independent judgment when making those decisions and let Givens (and Edens), who stood on both sides of the deal, control the negotiation and sale process.[230]  According to Plaintiff, these pled facts make "[t]his [an] entire fairness case."[231]  I agree.

Following Edens' and Givens' abstention from the vote, the Acquisition was approved by the Board members who served on the Transaction Committee—Malone, Van der Hoof Holstein, Colbert and McFarland.  Since the test for director interest and independence is generally the same for purposes of this analysis as the test under the first prong of *Aronson*,[232] for the same reasons I determined those directors were interested or not independent under *Aronson*, I find that Plaintiff has

---

[230] Compl. ¶ 150.

[231] Pl.'s Answering Br. 1.

[232] *TVI Corp.*, 2013 WL 5809271, at *14.  I note, for the sake of clarity, that finding a director is either interested or not independent under the first prong of *Aronson* will not always translate to a finding of interest or lack of independence in the fiduciary duty analysis.  Under the first prong of *Aronson*, the focus is on whether the director's interest or conflict creates a reasonable doubt that the director could objectively consider a demand.  In the fiduciary duty context, the focus is on whether the director's interest or conflict caused the director to do or not do something that has harmed the corporation.  While the inquiries are different, and do not necessarily overlap, they lead to the same answer here, at least as alleged in the Complaint.  *See id.* at *12.

61

well-pled that each of those directors was interested or not independent with respect to the Challenged Transactions.[233]

Additionally, the Complaint alleges that Edens and Givens were the sole members of the Pricing Committee, setting the terms of the Secondary Offering under which they both (along with FIG) received share options. The Complaint also alleges that Givens, who works for Fortress, negotiated the Holiday Management Agreement with her employer's affiliate. Those allegations are sufficient to raise a reasonable inference that Edens and Givens were interested in the Challenged Transactions. Because the Complaint adequately pleads that no independent and disinterested Board majority approved the Transactions, the standard of review, for now, is entire fairness.

I note that "[t]he applicability of the entire fairness standard 'normally will preclude a dismissal of a complaint on a Rule 12(b)(6) motion to dismiss.'"[234]

---

[233] *See also Limited*, 2002 WL 537692, at *7 ("For the reasons set forth [in the Rule 23.1 analysis], I am satisfied that the Complaint states a claim for breach of the duty of loyalty. The challenged transactions were approved by a unanimous board of twelve; six of those directors were either interested or subject to disqualifying doubts about their independence. As set forth below, the challenged transactions, while perhaps not constituting corporate waste, appear unfair to the stockholders. Thus, because the challenged transactions were not approved by a majority of independent and disinterested directors, the Complaint states a loyalty claim that survives a challenge under Court of Chancery Rule 12(b)(6).").

[234] *In re Riverstone Nat'l, Inc. S'holder Litig.*, 2016 WL 4045411, at *15 (Del. Ch. July 28, 2016) ("Once a plaintiff rebuts the business judgment rule, the burden shifts to the defendant to establish that the [transaction] was the product of both fair dealing and fair price.").

Nevertheless, I review briefly the pled facts and find that the Complaint adequately alleges that the Challenged Transactions were not entirely fair.

Entire fairness review asks whether the transaction (i) was the product of "fair dealing," and (ii) reflected a "fair price."[235] I address both elements, albeit in reverse order. As for unfair price, Plaintiff argues that unfair price is revealed by the following pled facts: (i) the market reacted poorly to the Acquisition ("New Senior's stock price plummeted")[236]; (ii) only New Senior submitted a final bid for the Holiday Portfolio[237]; (iii) Givens failed to leverage the fact that New Senior was the only serious bidder and justified her adjustment to the initial bid by drawing a comparison to a transaction that was very different from the Acquisition involving a company that elected not to bid for the Holiday Portfolio[238]; (iv) Givens and the Transaction Committee allowed New Senior to enter into a no-bid management agreement with Holiday at above-market rates[239]; (v) Edens and Givens caused the

---

[235] *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1115 (Del. 1994) (internal citations omitted).

[236] Pl.'s Answering Br. 53. *See also* Compl. ¶¶ 18, 124, 126.

[237] Compl. ¶ 83.

[238] Compl. ¶¶ 83–85, Klein Aff. Ex. 11 (June 1, 2015 Committee Minutes), at SNR00000241 ("Ms. Givens explained that the reduced purchase price was derived by applying the capitalization rate implied by the purchase price for the last portfolio marketed by Holiday and sold to Northstar, which was 6.1%.").

[239] Compl. ¶¶ 95–96.

Board to approve a Secondary Offering that generated substantial fees for Fortress[240]; and (vi) the Secondary Offering was at a grossly discounted price that benefited Fortress, Givens and Edens but harmed New Senior by causing a sudden loss in market capitalization amounting to approximately $100 million.[241] These facts more than adequately allow for a reasonable inference of unfair price.

Allegations revealing unfair dealing should focus on "when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained."[242] With these elements clearly in mind, Plaintiff alleges the following facts that allow a reasonable inference of an unfair process: (i) Fortress, Edens, and Givens stood on both sides of the deal, and then initiated, structured, and negotiated each element of the Challenged Transactions[243]; (ii) the Transaction Committee was flawed in its composition, led by a Chairman who sat on the board of the primary lender for the transaction, and ineffective in its execution, *inter alia*, by allowing Givens to negotiate exclusively on behalf of New Senior "against" her employer (Fortress)[244];

---

[240] Compl. ¶¶ 104, 109–113.

[241] Compl. ¶¶ 102, 110–111, 115, 121–122.

[242] *Lynch*, 638 A.2d at 1115.

[243] Compl. ¶¶ 73–74, 151.

[244] Compl. ¶¶ 42, 82.

(iii) the Transaction Committee allowed Givens to make her bids without direction from, or even consultation with, the Transaction Committee and without the benefit of advice from the Committee's financial advisor (Greenhill)[245]; (iv) Givens provided Greenhill with flawed data to use in its fairness opinion relating to the Acquisition[246]; (v) the Transaction Committee did not seek a fairness opinion with respect to the Secondary Offering or the Holiday Management Agreement[247]; (vi) even though there were no other bidders, the Transaction Committee allowed Givens to commit to an acquisition agreement with no financing contingency, thereby ensuring that the Company would have to go forward with the unfair Secondary Offering[248]; (vii) the Board allowed Givens and Edens alone to serve on the Pricing Committee even though they (and Fortress) stood to benefit personally from the offering (to the exclusion of other stockholders)[249]; and (viii) the Board approved the no-bid management agreement Givens offered to Holiday without even seeing the terms of Holiday's incentive compensation.[250]   It can be reasonably

---

[245] Compl. ¶¶ 73, 77, 83, 86–87, 100–101.

[246] Compl. ¶¶ 89–94.

[247] Compl. ¶ 112.

[248] Compl. ¶ 102.

[249] Compl. ¶¶ 109, 111.

[250] Compl. ¶ 97.

inferred from these allegations that New Senior's directors engaged in an unfair process when negotiating and approving the Challenged Transactions.[251]

### 3. The Exculpatory Charter Provision

Contrary to Plaintiff's assertion, the application of entire fairness review does not necessarily result in denial of the motion to dismiss with respect to *each* individual defendant.[252] New Senior's certificate of incorporation contains a Section 102(b)(7) exculpatory provision at Article Six, which exculpates New Senior's directors from liability to the fullest extent permitted by Delaware law.[253]

---

[251] Defendants maintain that Edens and Givens cannot be held liable because they both abstained from the Board vote approving the Challenged Transactions. Defs.' Opening Br. 55. The argument ignores Givens' nearly exclusive role in negotiating the Challenged Transactions, Givens and Edens' role as sole members of the Pricing Committee and settled Delaware law that rejects the "Geronimo theory," which posits that a director can avoid liability by "extricating himself from decision-making about something he knows is going to be bad [by] pull[ing] the ripcord" and abstaining from the vote. *See Cambridge Ret. Sys. v. Decarlo*, C.A. No. 10879-CB, at 14 (Del. Ch. June 16, 2016) (TRANSCRIPT). *See also Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130 (Del. Ch. 2006) (rejecting argument that abstaining from the vote shields a director from liability); *Valeant*, 921 A.2d at 753 (same); *Frederick Hsu*, 2017 WL 1437308, at *38 (same).

[252] *In re Cornerstone Therapeutics Inc., Stockholder Litig.*, 115 A.3d 1173, 1179 (Del. 2015) ("We now resolve the question presented by these cases by determining that plaintiffs must plead a non-exculpated claim for breach of fiduciary duty against an independent director protected by an exculpatory charter provision, or that director will be entitled to be dismissed from the suit. That rule applies regardless of the underlying standard of review for the transaction.").

[253] Klein Aff. Ex. 36 (Amended and Restated Certificate of Incorporation of New Senior Investment Group Inc.), at 8.

Thus, only claims that, as a matter of law, cannot be exculpated by that provision can survive the motion to dismiss.[254]

Breaches of the duty of loyalty are not exculpated under Delaware law.[255] I have already addressed the alleged breaches of the duty of loyalty by Edens, Givens, Malone, Van der Hoof Holstein, Colbert and McFarland (and found them to be adequately pled). Accepting the well-pled facts of the Complaint as true, they each were in a conflicted state when they negotiated and approved the Challenged Transactions and, in that state, acted in a manner that advanced either their own interests or the interests of those to whom they were beholden at the expense of the Company.[256] These breach of loyalty claims cannot be extinguished at the pleading stage under Section 102(b)(7).

---

[254] *Cornerstone*, 115 A.3d at 1180 ("[T]he mere fact that a plaintiff is able to plead facts supporting the application of the entire fairness standard to the transaction, and can thus state a duty of loyalty claim against the interested fiduciaries, does not relieve the plaintiff of the responsibility to plead a non-exculpated claim against each director who moves for dismissal.").

[255] *Id.* at 1179–80 ("When a director is protected by an exculpatory charter provision, a plaintiff can survive a motion to dismiss by that director defendant by pleading facts supporting a rational inference that the director harbored self-interest adverse to the stockholders' interests, acted to advance the self-interest of an interested party from whom they could not be presumed to act independently, or acted in bad faith.").

[256] *Guth v. Loft*, 5 A.2d 503, 510 (Del. 1939) (holding that "[c]orporate officers and directors are not permitted to use their positions of confidence to further their private interests. . . . The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest.").

In Count II, Plaintiff alleges that Givens is separately liable for breaches of her duty of care and duty of loyalty in her capacity as a New Senior officer.[257] While Plaintiff has alleged similar breaches of the duty of care against all directors (including Givens in her capacity as director) under Count I,[258] those claims fall directly within the exculpatory charter provision so I will not address them further. The exculpatory provision, however, does not cover Givens in her capacity as officer.[259] Defendants acknowledge Givens' exposure but argue that the due care claim against her must be dismissed because the Complaint does not adequately differentiate between Givens' conduct as officer and her conduct as director. I disagree. Givens, as director, was not a member of the Transaction Committee and recused herself as director from Board level discussions and votes. Nevertheless, as officer, along with the remainder of her Fortress-based management team, she led all aspects of the negotiations and sale process, often without consulting or receiving direction from the Transaction Committee. Accordingly, Givens may be held liable

---

[257] With respect to the duty of care, Plaintiff alleges, for instance, that Givens' projections with respect to the rise of the Holiday Portfolio's occupancy rate were "grossly negligent" and that Givens justified the size of New Senior's bid by reference to a capitalization rate that she knew was not comparable to the acquisitions under consideration. Pl.'s Answering Br. 44–46; Compl. ¶¶ 89–93.

[258] Pl.'s Answering Br. 42. *See, e.g.*, Compl. ¶¶ 96–97 ("Therefore, the Board could not have been fully informed when it approved the Holiday Acquisition.").

[259] *Gantler v. Stephens*, 965 A.2d 695, 709 (Del. 2009).

for breaching her duties of care and loyalty to New Senior, to the extent such breaches are proven.[260]

## C. Plaintiff Has Stated a Viable Aiding and Abetting Claim

Finally, at Count III, the Complaint alleges aiding and abetting breaches of fiduciary duty against Fortress, Holiday, FIG, FOE I and FIG Corp. To state a claim of aiding and abetting, a complaint must plead facts in support of four elements: (1) the existence of a fiduciary relationship, (2) a breach of a fiduciary duty, (3) defendant's knowing participation in that breach and (4) damages proximately caused by the breach.[261] The first two elements have been addressed in my findings above. Defendants do not attack the Complaint's causation allegations. Thus, as is often the case in aiding and abetting litigation, given the Court's finding that Plaintiff has pled breach claims, the focus turns to whether Plaintiff has adequately pled "knowing participation" by the alleged aiders and abettors.

An adequate pleading of "knowing participation" requires a pleading of scienter.[262] "To establish scienter, the plaintiff must demonstrate that the aider and

---

[260] *McPadden v. Sidhu*, 964 A.2d 1262, 1275–76 (Del. Ch. 2008) ("Though an officer owes to the corporation identical fiduciary duties of care and loyalty as owed by directors, an officer does not benefit from the protections of a Section 102(b)(7) exculpatory provision, which are only available to directors. Thus, so long as plaintiff has alleged a violation of care or loyalty, the complaint proceeds against [the officer].").

[261] *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).

[262] *See RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816, 861–62 (Del. 2015) (quoting *Malpiede*, 780 A.2d at 1097) ("As an example, this Court has said that 'a bidder may be

abettor had actual or constructive knowledge that their conduct was legally improper," and that he acted with "an illicit state of mind."[263] "[T]he requirement that the aider and abettor act with scienter makes an aiding and abetting claim among the most difficult to prove."[264] Difficult, but not impossible.

Based on the well-pled facts in the Complaint, it is reasonably conceivable that all five of the alleged aiders and abettors knowingly participated in the directors' alleged breaches. Under Delaware law, "the knowledge of an agent acquired while acting within the scope of his or her authority [and the acts of agents in that scope] [are] imputed to the principal."[265] In *In re Emerging Communications*,[266] applying this fundamental agency principle, the court held that two entities were "liable for having aided and abetted" an individual defendant where the entities were under the control of that defendant and "were the mechanisms through which" that defendant "accomplished" the challenged transaction.[267] This same type of scheme is alleged

---

liable to the target's stockholders if the bidder attempts to create or exploit conflicts of interest in the board.'").

[263] *Id.* at 862 (internal quotation omitted).

[264] *Id.*

[265] *Metro. Life Ins. Co. v. Tremont Gp. Hldgs., Inc.*, 2012 WL 6632681, at *19 (Del. Ch. Dec. 20, 2012).

[266] *In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745 (Del. Ch. May 3, 2004).

[267] *Id.* at *38.

here—Givens and Edens are alleged to have facilitated the Challenged Transactions through the various Fortress subsidiaries named as aiders and abettors.[268]  Under basic principles of agency, all of their knowledge is imputed to the Fortress entities they served as agents.[269]

Defendants lament that Plaintiff has failed to plead that any of the alleged aiders and abettors materially benefited from the Challenged Transactions.[270]  Even if allegations of materiality were required to support an aiding and abetting claim, and Defendants cite no authority imposing that requirement, the Complaint goes to significant lengths to allege how the aiders and abettors benefitted (materially) from the Challenged Transactions.[271]

In their roles as director members of New Senior's Pricing Committee, Givens and Edens alone set the terms of the Secondary Offering while also being employed by and otherwise affiliated with FIG.  FIG, in turn, receives substantial management fees from New Senior based on New Senior's gross equity.[272]  The allegedly unfair

---

[268] Compl. ¶¶ 6–8, 28–33, 62, 73–82.

[269] *See Metro. Life*, 2012 WL 6632681, at *19 (applying agency principals in aiding and abetting analysis); *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 102 A.3d 155, 204 (Del. Ch. 2014) (same).

[270] Defs.' Opening Br. 59–60.

[271] *See, e.g.*, Compl. ¶¶ 65–72, 118–121.

[272] Compl. ¶ 7.

Secondary Offering approved by Givens and Edens caused New Senior's gross equity to increase substantially with resulting increases in FIG's management fees.[273] Givens and Edens also caused New Senior to issue "approximately $100 million in additional equity that New Senior did not need for the [] Acquisition" and thereby increased FIG's fees even more.[274] And, of course, by pushing New Senior into the Secondary Offering, Givens and Edens saw to it that FIG would receive options to purchase over 2 million shares of New Senior stock (at the discounted price).[275] Given these well-pled facts, it is reasonably conceivable that FIG knowingly participated in, and benefited from, the individual directors' breaches of their duty of loyalty or care.[276]

The allegations are similarly compelling against Fortress. Plaintiff alleges that Fortress pushed the Acquisition in furtherance of a broader plan to shift its assets under management to publicly-traded companies that were externally managed by Fortress, such as New Senior, so it (through FIG) could charge higher management

---

[273] Compl. ¶ 118.

[274] Compl. ¶ 7.

[275] Compl. ¶ 8.

[276] *Houseman v. Sagerman*, 2014 WL 1478511, at *8 (Del. Ch. Apr. 16, 2014) (holding that Section 102(b)(7) does not apply to aiding and abetting claims, and collecting cases).

fees over longer periods of time.[277]  He further alleges that FHIF, Fortress' private equity fund that is the majority owner of Holiday, pushed the Holiday sale to facilitate the "return of capital to its investors" in advance of its "maturity date of January 2017."[278]  Those allegations, when coupled with the allegations that Givens ran the negotiations for New Senior and made bids for the Holiday Portfolio without any authorization from a Board comprised of members that were either interested in the Challenged Transactions or beholden to others who were, create a reasonably conceivable narrative that Fortress knowingly participated in the Board's and Givens' breaches.[279]

To evaluate the sufficiency of the aiding and abetting claims pled against FOE I, FIG Corp and Holiday, one first needs to appreciate the close relationships of these entities within the Fortress network.[280]  FIG Corp. is the sole general partner

---

[277] Compl. ¶ 9.  Fortress has publically stated that it can generate between $375 million and $425 million of present market value for its shareholders from the fees it earns from managing $1 billion in a PCV.  Compl. ¶ 118.  As applied to the $266 million of invested capital generated by the Secondary Offering, Fortress can expect to generate between $99.75 million and $113.05 million in value, which is material to Fortress.  *Id.*

[278] Compl. ¶ 4.

[279] The Complaint also alleges that Fortress stood to gain from Holiday retaining the property management of the Holiday Portfolio.  Compl. ¶ 10.  Defendants take issue with this allegation because the property management fees would go to Holiday not Fortress.  Defs.' Opening Br. 60.  While that is true, Plaintiff has sufficiently alleged the connections between Fortress and Holiday which lead to the reasonable inference that Fortress, the indirect owner of a majority of Holiday's equity, would benefit from additional revenues collected by Holiday.

[280] *See* appendix.

of FOE I and, together with Edens and the remaining two Fortress-principals, it owns all of FOE I's limited partnership interests. FOE I, in turn, is the sole managing partner and sole owner of FIG, which is a subsidiary of Fortress and manages the Fortress private equity funds that own a majority of the Holiday interests. With the allegations outlined above pertaining to FIG and Fortress, just as in *Emerging Communications*, I am satisfied, for now, that Plaintiff has adequately pled that all of these networked entities were vehicles that aided and abetted the directors, and Givens as officer, in their alleged breaches of fiduciary duty.[281]

## III. CONCLUSION

Based on the foregoing, Defendants' motion to dismiss is **DENIED.**

**IT IS SO ORDERED.**

---

[281] *Emerging*, 2004 WL 1305745, at \*38 (finding aiding and abetting pled for two companies based on the allegations with respect to the person that controlled them).

